Ronald COLEMAN, Appellant,

v.

UNITED STATES, Appellee.

Donald COLEMAN, Appellant,

v.

UNITED STATES, Appellee.

Nos. 84–613, 84–653.

District of Columbia Court of Appeals.

Argued Oct. 18, 1985.
Decided Oct. 1, 1986.

**440**

W. Gary Kohlman, Washington, D.C., for appellant Ronald Coleman.

Allie Sheffield, with whom James Klein, Washington, D.C., was on brief, for appellant Donald Coleman.

T. Mark Flanagan, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell and Charles L. Hall, Asst. U.S. Attys., Washington, D.C., were on brief for appellee.

Before FERREN, ROGERS and STEADMAN, Associate Judges.

FERREN, Associate Judge:

A jury convicted appellants Ronald Coleman and Donald Coleman (who are not related) of attempted robbery while armed, D.C.Code §§ 22–2902, –3202 (1981), and convicted appellant Ronald Coleman of second degree murder while armed, *id.* §§ 22–2403, –3202. Appellants contend on appeal, first, that the testimony of the government's principal witness, Timothy McCain, was so inherently incredible that, as a matter of law, the trial court should have granted appellants' motions for judgment of acquittal. Second, appellants argue that they were denied the right to due process by the government's failure to make timely disclosure of a police report containing eyewitness McCain's first statement to the police. In this connection, appellants assert that the trial court abused its discretion during the rebuttal phase of the trial by refusing to allow the defense to recall McCain for cross-examination about the police report, and by limiting the scope of the cross-examination of the police officer, Kimalon Wright, who had prepared the report. Third, appellant Donald Coleman contends that the prosecutor's rebuttal argument was so improper that it denied appellant his right to a fair trial. Finally, both appellants assert that the trial court erred in denying the defense motion for a mistrial after the jury, on three occasions, had stated its inability to reach a verdict. We affirm all convictions.

## I.

The government's principal evidence was the eyewitness testimony of Timothy McCain. On August 14, 1982, at approximately 3:00 a.m., McCain, then fifteen years old, and his girlfriend, April Tazewell, were walking in their Southwest neighborhood on Elmira Street heading toward South Capitol Street. As they neared

the bottom of the hill, McCain heard someone "scream" or yell for "help." He looked to his left and saw two men about twenty feet away on the other side of Elmira Street apparently accosting a third man. Street lights illuminated the area.

McCain recognized the man being accosted, Stanley Bowman, and one of the two assailants, appellant Ronald Coleman. He knew both of these men casually, by name, from "the streets." Although McCain did not know the name of the other assailant, he recalled having seen him with Bowman on prior occasions. McCain later identified both Ronald Coleman and Donald Coleman, from photographic arrays and in court, as the assailants.

McCain testified that Ronald Coleman was holding a nine-inch long poker or ice pick and was wearing white tennis shoes, no socks, a white T-shirt, and a white "flop" hat with a blue stripe. Donald Coleman was holding a large, black gun "face down," that is, with the barrel pointing toward the ground. McCain did not see anything in Bowman's hands.

McCain then heard Ronald Coleman exclaim, "Give it up, give it up, nigger, now give it up!" Bowman shook his head and said, "No." In response, Ronald Coleman thrust the poker or ice pick into Bowman's stomach and then twisted it in a circular motion. As he was falling to the ground, Bowman placed his hands on Ronald Coleman. During this time, Donald Coleman, still holding a gun, was maintaining surveillance over the immediate area. Upon spotting McCain, he began staring at him. Following the stabbing, and upon noticing that Donald Coleman was staring at something, Ronald Coleman also began looking at McCain. During the "few seconds" that

"all attention was draw[n] on [McCain]," Bowman managed to rise, run toward McCain, and then disappear into an alley. McCain then backed away and ran. When he looked back, he saw Ronald and Donald Coleman running in what appeared to be the same direction as Bowman.

Wesley Claiborne, who lived approximately six blocks from the scene of the stabbing, also testified for the government. He said that at about 3:15 a.m. he was awakened by the sound of someone knocking on the door of an adjacent apartment. After someone knocked on his own door, he opened it. Bowman, whom he knew as "Popsie," stood at the door and claimed he had been shot. After entering, Bowman said he had been stabbed. Claiborne immediately directed his girlfriend, Janet Fleming, to call an ambulance. When Claiborne asked Bowman what had happened, Bowman replied only that he was "running" and that his assailant "had white shorts on, white shirt and blue hat, and he didn't say no name. He wouldn't tell me no name." Although Bowman refused to say anything else, Claiborne stated on cross-examination that Bowman knew from whom he was running. "I will say, that's the thing about it, he knew, he says he didn't want to tell." After an ambulance arrived and removed Bowman, Claiborne never saw Bowman again. Police arrived at Claiborne's apartment after the ambulance had arrived.[1]

While Bowman was still in Claiborne's apartment, McCain appeared and came into the apartment. McCain testified that he did not remember whether he had told Claiborne he had witnessed the stabbing. Claiborne himself recalled that the day after the stabbing, McCain said he had been between 100 and 150 feet away when the stabbing occurred (in contrast with

---

1. Yussef Akbari, a general surgeon at the Greater Southeast Community Hospital who treated Bowman upon his arrival at the hospital, testified as an expert witness in general surgery and as a fact witness. Bowman had suffered a one-half inch laceration shaped like an inverted "V" on the left side of the abdomen. Akbari also stated that Bowman incurred internal lacerations to numerous organs and blood vessels. Such injuries were consistent with having been made with a sharp instrument, such as a poker, where the instrument was moved around, once inserted, or where the victim moved about in response to the puncturing. He testified that Bowman died on Sunday, August 15, and that the cause of death was a stab wound to the stomach.

McCain's own trial testimony that he had been twenty feet away) and that McCain implied he had been too far away to recognize the perpetrator.

McCain testified that he had talked to a policewoman outside Claiborne's apartment, given her his name, told her he had seen the incident, but had not told her what had happened. "I just said that I seen it." He also claimed that the officer did not ask him what happened. "She just took my name down."

Ronald Coleman visited McCain the next day. Coleman wanted to know if McCain had seen "what happened that night." When McCain said "Yes," Coleman told him "not to tell anyone." McCain responded, "No, I won't tell anyone."

The next day, August 16, Detective Kerwood C. Nixon displayed a series of photographic slides to McCain, who selected a slide of appellant Ronald Coleman. Nixon testified that McCain had said, "That's him, Ronnie Coleman, only his hair is a little shorter," and that McCain also had said Coleman "was the stabber." At a later date, McCain also selected a photograph of Donald Coleman. After Nixon had asked him to write any comments on the back of the photograph, McCain wrote: "That is the man [with] Ronnie at the time of the cutting" and signed his name.

The police arrested Ronald Coleman on August 17 and Donald Coleman on August 19. Detective Donald Nixon testified that when Donald Coleman was advised of his rights, he said that he was there when someone stabbed Bowman but that the police had the wrong person.

Appellant Ronald Coleman testified on his own behalf, presenting an alibi defense.[2] He stated that on August 13, from approximately 9:00 p.m. until 2:00 a.m., he was socializing with a girlfriend, Sue, in the Elmira and South Capitol Streets neighborhood. Around 2:00 a.m. he and Sue met several of his male friends on top of the Elmira Street hill. Coleman and his male friends, without Sue, then walked north on South Capitol Street to the vicinity of the Atlantic Carry-Out, located in a shopping center at Atlantic and South Capitol Streets, about six blocks away from Elmira and South Capitol Streets. Appellant claimed that he had remained there with his friends until 5:00 a.m., never venturing back to Elmira Street. Although he acknowledged that he knew Donald Coleman, Bowman, and McCain before August 1982, he denied ever encountering or seeing them that night. He also said he was wearing black clothing.[3] On cross-examination, Ronald Coleman denied visiting Claiborne's apartment or talking with any police officer between 3:00 and 4:00 a.m.[4]

April Tazewell, McCain's girlfriend at the time of the stabbing, also testified in Ronald Coleman's defense. She said that during the early morning hours on August 14, 1982, she and McCain were walking near the intersection of Elmira and South Capitol Streets when they saw three boys running up Elmira Street. She testified that it was too dark to see their faces or clothes, that the boys were running too fast to see their faces, and that she never saw the boys do anything but run. Although she noted that the distance between her and

2. Appellant Donald Coleman's only witness was Jonathan S. Abady, the defense investigator working for his attorney, who took one of the three statements McCain had given to defense investigators (the October 1982 statement). On cross-examination, Abady acknowledged that Darryl Rawlins, a friend of Ronald Coleman's who (according to McCain) was doing "everything he [could] to get him out," had accompanied McCain to the Public Defender Service office where a majority of the statement was taken, and that Rawlins was with McCain for the taking of that part of the statement.

3. Several other defense witnesses attempted to corroborate Ronald Coleman's alibi defense. Two of those witnesses contradicted each other on how long Ronald Coleman and his friends were at the shopping center located at Atlantic and South Capitol Streets.

4. Ronald Coleman admitted prior convictions for attempted robbery (1981), possession of a prohibited weapon (1981), unlawful possession of narcotics (1981), and robbery (1979).

the boys was "not that far," her testimony indicated that the distance was farther than the twenty feet away that McCain had recalled. She also stated that, upon seeing the boys run, McCain told her not to pay any attention. She and McCain then walked to her house. She added that, earlier in the evening, she and McCain had been smoking marijuana, an accusation McCain had denied during cross-examination.

Ronald Coleman also called Wesley Claiborne as a witness. After first stating that McCain never had told him anything about what had happened, Claiborne finally acknowledged, still on direct examination, that McCain had told Claiborne "he couldn't see near one of" the assailants. On cross-examination, defense counsel for Donald Coleman asked Claiborne to verify, instead, that McCain had told Claiborne that McCain could not see the faces of either assailant. Claiborne responded:

> Okay, what happened is that when he went to the pizza shop I guess he was ordering food, right, he said when he came out of that shop that is when he seen Stanley get up—you know, the other dude was standing over top of Stanley, he saw Stanley get up and ran off—he seen the other dude at the corner with the pistol in his hand. That's the only thing he told me.

When defense counsel then cross-examined Claiborne about his earlier testimony that McCain had said he was near a pizza or carry-out shop and was 100 to 150 feet away from the stabbing, Claiborne stated, "No, that's as far as I estimated, you know, as far as from my eyes."

In rebuttal, the government offered the testimony of Metropolitan Police Officers Kimalon Wright and Larry Fripp. Wright testified that she and Fripp had been the first officers to arrive at Claiborne's apartment to investigate the stabbing. While Wright was attempting to locate witnesses, McCain approached and told her that a person wearing white shorts and a white T-shirt had been involved (whereas McCain himself had testified he had not told Wright what had happened, only that he had "seen it"). She also encountered Ronald Coleman (whom she identified in court) standing outside on the front step of Claiborne's apartment. Coleman approached and asked her about the condition of Bowman. Wright asked Coleman who he was. After some hesitation, Ronald Coleman gave her his name. Coleman then confirmed that he knew the victim and gave the officer Bowman's name and address. When asked if he was kin, Coleman answered yes, saying he was Bowman's sister's boyfriend. He then asked to speak to McCain. Ronald Coleman left to tell Bowman's sister that Bowman was going to the hospital. Wright said Coleman was wearing a brown "Peter" jacket, long blue jeans, and white sneakers with no socks.[5]

## II.

Appellants assert that McCain's testimony was so inherently "incredible" that the trial judge should have granted their motions for judgment of acquittal as a matter of law. The trial court, however, denied the motions, stating, "I do not find that the testimony of Mr. McCain is so inherently incredible that a jury could not, if they

5. Officer Fripp testified that it would take only about ten minutes to walk from the intersection of Elmira and South Capitol Streets (the site of the stabbing) to either Atlantic and South Capitol Street (the site of Coleman's alibi) or to Ronald Coleman's home (17 Brandywine Street). Fripp, who has been assigned to this area since 1973, said he recognized Ronald Coleman from having seen him in the neighborhood previously. He also noted that he saw Ronald Coleman on a sidewalk outside Claiborne's apartment on the early morning of the stabbing.

Several other witnesses also testified on rebuttal.

On surrebuttal, appellant Ronald Coleman testified that on several earlier occasions, Officer Fripp had harassed him. Ronald Coleman claimed that Fripp had chased him several times for "dealing reefer" and had stated he was going to "get" him. Coleman also said that when he, Coleman, was riding a motorcycle, Fripp had signalled to Coleman to pull over. When Coleman had refused and kept going, Fripp pursued, but failed to apprehend him.

chose to, accept it as true and accurate." We agree.[6]

In *In re: A.H.B.,* 491 A.2d 490, 496 n. 8 (D.C.1985), we set forth the standards for invoking the doctrine of "inherent incredibility":

> The doctrine of inherent incredibility can be invoked only when the testimony can be "disprove[d] ... as a matter of logic by the uncontradicted facts or by scientific evidence," or when "the person whose testimony is under scrutiny made allegations which seem highly questionable in the light of common experience and knowledge, or behaved in a manner strongly at variance with the way in which we would normally expect a similarly situated person to behave." *Jackson v. United States,* 122 U.S.App.D.C. 324, 329, 353 F.2d 862, 867 (1965) (footnotes omitted). This is a very stringent test which has been met in only a tiny number of cases, of which the twenty-year-old *Jackson* case is one of the most recent.

*See also United States v. Smith,* 592 F.Supp. 424, 441 (E.D.Va.1984), *vacated on other grounds,* 780 F.2d 1102 (4th Cir.1985)

(en banc) ("cases holding the testimony of a government witness unbelievable as a matter of law are exceedingly rare. The doctrine has been reserved for cases where the witness' testimony contradicts indisputable physical facts or laws").

Appellants assert that McCain's trial testimony meets these criteria. They argue that McCain's "lies" and "inconsistent statements" to the three defense investigators, police, lay witnesses, and grand jurors rendered his trial testimony unbelievable and unreliable as a matter of law.[7] Although McCain's trial testimony does differ from several previous statements he was said to have made, we cannot say that this testimony can be disproved, as a matter of logic, by uncontradicted facts or by scientific evidence. Nor can we say that anything in McCain's behavior or testimony was highly questionable in the light of common experience and knowledge or that his pretrial behavior was abnormal under the circumstances.

First, McCain acknowledged at trial that he deliberately had lied to the three defense investigators in saying, for example, that he was 21 years old, had grown up in

6. In evaluating a claim of insufficiency of the evidence, this court must review the evidence in the light most favorable to the government, recognizing the jury's right to weigh the evidence, determine the credibility of witnesses, and draw inferences from their testimony. *Hall v. United States,* 454 A.2d 314, 317 (D.C.1982); *Crawford v. United States,* 126 U.S.App.D.C. 156, 158, 375 F.2d 332, 334 (1967); *Curley v. United States,* 81 U.S.App.D.C. 389, 392–93, 160 F.2d 229, 232–33, *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). This court can reverse only where the government has produced no evidence from which a reasonable mind might infer guilt beyond a reasonable doubt. *Frendak v. United States,* 408 A.2d 364, 371 (D.C. 1979).

When the government rested its case, appellants both made motions for judgment of acquittal, which the trial court denied. Appellants thereupon chose to present evidence, following which the motions were renewed unsuccessfully. We have held that when a defendant introduces evidence following the denial of a motion for judgment of acquittal at the close of the government's case, that motion is deemed waived and is not properly the subject of appel-

late review. *See, e.g., Bedney v. United States,* 471 A.2d 1022, 1024 n. 3 (D.C.1984) (per curiam) (citing *Franey v. United States,* 382 A.2d 1019, 1021 (D.C.1978)). Consequently, in evaluating appellant's claim of insufficiency, this court must consider the totality of the evidence presented at trial, including that admitted in rebuttal. *Bedney,* 471 A.2d at 1024 n. 3; *accord Franey,* 382 A.2d at 1022.

7. Appellant Ronald Coleman contends that these lies include: (1) McCain's age; (2) his education; (3) where he had grown up; (4) whether he had been in the service; (5) whether he was high on the night in question; (6) whom he was with when he saw the incident; (7) how well he knew the deceased; (8) whether he had ever seen the deceased with appellant; (9) whether he had seen a robbery or a fight; (10) how far away he was from the incident; (11) how often he had seen the deceased with the co-defendant; (12) whether he saw a poker or a knife; (13) whether he could tell what kind of gun the second assailant was holding; (14) whether he spoke to the assailants before the incident; (15) whether he confronted the assailants immediately after the stabbing.

Detroit, and was on furlough from the Army. He also acknowledged that he had lied in relating versions of the events radically different from his testimony at trial. He claimed he had done so because he was frightened. McCain was fifteen years old at the time of the stabbing, and he knew both appellants had seen him witness the crime. McCain thought he had to talk to the defense investigators, however, so he testified he "was just talking." He "just said things so [he could] get [the investigator] out of [his] house"; he just told them "what they wanted to hear." In short, he was "trying to keep [himself] safe." This explanation could lead a juror reasonably to conclude these particular lies did not necessarily undermine the credibility of McCain's trial testimony, especially in the light of other evidence tending to implicate appellants in Bowman's death.

Second, appellants assert that McCain lied at trial about how far he had been from the attack on Bowman (twenty feet), given his pretrial statements to Claiborne (100 to 150 feet) and to the grand jury (50 yards). This is not a fatal inconsistency warranting a finding of inherent incredibility. In the first place, on cross-examination in Ronald Coleman's defense case, Claiborne acknowledged that the 100 to 150 foot distance was "as far as I estimated, you know, as far as from my eyes," suggesting that the estimate may have come from Claiborne himself after talking with McCain. Even if McCain did describe the distance to Claiborne as 100 to 150 feet, however, adding that he was too far away to recognize the assailant, that is explainable to some extent by fear. McCain testified at trial that Claiborne knew Ronald Coleman and that "he [Claiborne] could have been trying to help Ronnie." Before the grand jury, McCain did estimate the distance at fifty yards, consistent with Claiborne's trial testimony. Significantly, though, when McCain testified at trial he was asked to estimate the distance using courtroom distances, which turned out to be twenty feet. Apparently, this was the first time McCain was asked a question

about comparable distances. Moreover, he specifically testified he had difficulty accurately describing a distance using feet and yards. Finally, although the testimony of McCain's girlfriend, April Tazewell, indicated that the distance was further than McCain had testified it was, she also acknowledged that the three boys she had seen running, while she was with McCain, were "not that far" away. Once again, the discrepancies in McCain's statements are sufficiently explainable that the test for inherent incredibility is simply not met. On this evidence the jury, not the court, should determine credibility.

Third, when McCain was before the grand jury, the prosecutor asked him, with reference to Bowman and the two assailants: "What were they doing?" McCain replied: "They were more or less, like, fighting. They was fighting. They was cussing and fussing and throwing punches, and all of that kind of stuff like that." He essentially told the defense investigators the same thing. McCain's trial testimony, however, described two men accosting a third. When confronted on cross-examination with such apparent inconsistencies, McCain claimed that Bowman had put his hand on Ronald Coleman as Bowman was falling down, and that he had considered this action to be somewhat like "throwing a punch" or "fighting." Again, while McCain's pretrial statements and explanation on cross-examination may have affected the credibility of his trial testimony, this kind of apparent inconsistency in describing a fast-moving street altercation is standard fare for a jury, not for court-application of the inherent incredibility doctrine.

Finally, although McCain's trial testimony obviously did differ from some of his previous statements, other evidence corroborated his trial testimony. For example, appellant Donald Coleman admitted he was at the scene and that a stabbing had occurred; the medical evidence demonstrated that Bowman's wound was consistent with causation by a sharp instrument that was rotated when inserted, as McCain had de-

scribed; and Bowman's description to Claiborne of one assailant's clothing matched McCain's description.

▆ In sum, McCain's testimony was not inherently incredible as a matter of law. His testimony obviously presented a serious credibility issue for the jury's resolution. But, if believed, McCain's testimony was sufficient, along with the other evidence, to persuade a reasonable jury to reach guilty verdicts beyond a reasonable doubt.

### III.

Both appellants appeal from trial court rulings during the rebuttal phase of the trial. After the direct examination of Officer Wright, a government rebuttal witness, the government produced to the defense all Jencks material applicable to Wright.[8] After a brief review of those documents, counsel for appellant Ronald Coleman asserted that certain information in one of the documents should have been produced during the government's case-in-chief as Jencks material applicable to McCain. Counsel for appellant Donald Coleman added that the same information should have been disclosed before trial under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[9] The trial court rejected these contentions and declined to allow the recall of McCain for additional cross-examination. The court also refused to permit counsel to cross-examine Officer Wright about the subject matter of the Jencks material, indicating that such an inquiry lacked an adequate foundation and was beyond the scope of direct examination. On appeal, appellants renew these Jencks and *Brady* claims.[10]

The government had called Officer Wright to rebut Ronald Coleman's testimony that he was not in the immediate vicinity of Claiborne's apartment early on the morning of the crime, as well as to rebut Coleman's testimony that he was wearing black clothing on the night of the incident. The Jencks material of Officer Wright was a two-page, thirteen paragraph Metropolitan Police Department "Witness Statement" from Wright to an MPD homicide detective, transcribed two days after the stabbing. The disputed information consisted of the following paragraph:

> Mr. McCain stated he was standing at South Capitol Street and Elmira and saw the victim and two subjects standing together and it appeared that the two subjects were robbing him. The Victim broke and ran toward him, "Stating they were after him, and don't let them get him." He was stumbling at the same time. At this time he grabbed hold of the Victim and assisted him but the Victim broke loose and ran toward the apartment. At this time he looked back toward where the subjects had been and saw them running. He then proceeded toward the apartment [to] which the Victim ran. He remained in the area of the apartment building until the police arrived.

Defense counsel found this passage particularly important because, as discussed at length earlier, they sought to undermine McCain's credibility by showing that, in out-of-court statements, McCain had told significantly different versions of the circumstances surrounding the stabbing of Stanley Bowman from the version he presented in court. Specifically, defense counsel claimed they could have used this portion of Officer Wright's report to show

8. Under the Jencks Act, 18 U.S.C. § 3500 (1982), defense counsel may move for production of all statements "of the witness in the possession of the United States which relate[ ] to the subject matter as to which the witness has testified."

9. We have defined *"Brady* material" as "exculpatory information, material to a defendant's guilt or punishment, which the government knew about but failed to disclose to the defendant in

time for trial." *Lewis v. United States,* 393 A.2d 109, 114 (D.C.1978), *aff'd after rehearing,* 408 A.2d 303 (D.C.1979).

10. More specifically, Ronald Coleman asserts the Jencks claim which Donald Coleman adopts. Appellant Donald Coleman asserts the *Brady* claim.

that, in at least two significant ways, McCain's trial testimony was inconsistent with his statement to the police. First, although he testified at trial that the second man held a gun, he apparently did not tell that to Officer Wright. Second, McCain testified at trial that, after the stabbing, Bowman and his assailants had run one way while McCain had run another. He apparently told Officer Wright, however, that, after the stabbing, Bowman had run toward McCain, who physically supported him. We conclude, however, that the passage in dispute constitutes neither Jencks nor *Brady* material.

## A. Jencks Act

Appellants assert the trial court erred in ruling that the paragraph in question from Wright's "witness statement" did not constitute Jencks material of McCain. As a consequence, they argue, the court improperly restricted the scope of McCain's cross-examination.

"For the Jencks Act to apply and for the right of discovery to exist under the Act, the records at issue must be 'statements' within the meaning of the Act." *Moore v. United States*, 353 A.2d 16, 18 (D.C.1976). In relevant part, the Act defines "statement" as either "a written statement made by [a] witness and signed or otherwise adopted or approved by him," or a "recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by [a] witness and recorded contemporaneously with the making of [the] oral statement." 18 U.S.C. § 3500(e)(1) and (2) (1982). As to the second definition, the transcription "must be a continuous, narrative recording rather than mere selective notations or excerpts from the oral statements." *Moore*, 353 A.2d at 18. As the Supreme Court has emphasized, "It is clear that Congress was concerned that only those statements which could properly be called the witness' own words should be made available to the defense for purposes of impeachment," and that, to guard against "distortion," "*summaries of an oral statement* which evi-

dence substantial selection of material, or *which were prepared after the interview without the aid of complete notes, and hence rest on the memory of the agent, are not to be produced.*" *Palermo v. United States*, 360 U.S. 343, 352–53, 79 S.Ct. 1217, 1224–25, 3 L.Ed.2d 1287 (1959) (emphasis added). Our standard of review on appeal is whether the trial judge "made a reasonable determination" that the notes were not a statement under the Jencks Act. *United States v. North American Reporting, Inc.*, 238 U.S.App.D.C. 300, 304 n. 6, 740 F.2d 50, 54 n. 6 (1984).

■ The paragraph in question fails to meet the criteria for Jencks Act "statements" of McCain. No evidence suggests that McCain adopted the information. Also, Officer Wright recorded the statement from memory two days after the event, not contemporaneously with its alleged making. Moreover, it is not a continuous, narrative recording; it is more in the nature of selective notations and excerpts from oral statements. In sum, the paragraph is a summary of oral statements prepared after an interview without the aid of notes—a summary of the sort held nonproducible in *Palermo*. The paragraph, therefore, cannot be characterized as McCain's own words for use as impeachment.

## B. *Brady* Material

Appellant Donald Coleman asserts that the information in the paragraph constitutes *Brady* material because it could have been used to impeach McCain's credibility. In *Brady*, the Supreme Court announced a general rule by which the due process implications of a prosecutor's nondisclosure of material evidence favorable to a defendant should be measured: "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196.

In *United States v. Bagley,* ——— U.S. ———, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Supreme Court clarified several aspects of the *Brady* rule. The issue in *Bagley* concerned the standard of materiality applicable in determining whether a conviction should be reversed because the prosecutor had failed to disclose requested evidence that could have been used to impeach government witnesses. Id. at 3377. The court reiterated that impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule. *Id.* at 3380. "Such evidence is 'evidence favorable to an accused,' *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196, ... so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Id.* But, to justify a reversal, the withheld evidence must be "material in the sense that its suppression undermines confidence in the outcome of the trial." *Id.* at 3381.

In fashioning a standard of materiality, the *Bagley* plurality opinion modified the "no request," "general request," "specific request" refinement of *Brady* developed in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The court held in *Bagley* that the following standard, drawn from *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (criteria for judging ineffective assistance of counsel), is "sufficiently flexible" to cover all three situations of prosecutorial failure to disclose evidence favorable to the accused:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Bagley,* 105 S.Ct. at 3384.

*Brady, Agurs,* and now *Bagley* call for "retrospective evaluations, *i.e.,* decisions as to whether a defendant's due process rights had been violated by the government's withholding of particular evidence." *Lewis v. United States,* 408 A.2d 303, 306

(D.C.1979); *Wiggins v. United States,* 386 A.2d 1171, 1174 (D.C.1978). In this case, appellant asserts that, because McCain testified at trial that Donald Coleman had a gun, the defense could have impeached McCain by showing that his first statement to the police did not mention a gun. Coleman also argues that the reference in the paragraph to McCain's assisting Bowman is "irreconcilable" with McCain's trial testimony. Because McCain stated at trial that he did not lie to the police, appellant asserts that the foregoing "omissions and inconsistencies" in the paragraph prove he either "lied to police or lied to the jury." Finally, because the credibility of McCain was crucial, appellant maintains there is a reasonable probability that such impeachment would have affected the outcome of the trial.

We conclude that, despite some arguable inconsistencies between McCain's in-court testimony and the paragraph in Officer Wright's "witness statement" report, such inconsistencies were not material, as that concept is to be understood from *Bagley.* That is to say, we cannot conclude with reasonable probability that, "had the evidence been disclosed to the defense" and used by the defense to impeach McCain, "the result of the proceeding would have been different." *Bagley,* 105 S.Ct. at 3384.

We consider, first, the gun. " '[A] failure to assert a fact, when it would have been natural to assert it, amounts in effect to an assertion of the non-existence of the fact' and constitutes a 'prima facie' inconsistency." *Hill v. United States,* 404 A.2d 525, 531 (D.C.1979) (per curiam), *cert. denied,* 444 U.S. 1085, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980) (quoting 3 A. WIGMORE, EVIDENCE § 1042 (Chadbourne Rev.1970)). Under this standard, the absence of a reference in the paragraph to a gun is hardly an "inconsistency." Officer Wright's conversation with McCain occurred at Claiborne's apartment under hectic conditions and was not a comprehensive interview. Therefore, as the trial court noted, the paragraph could not have been intended as

a detailed account; obviously, it lacks many of the crucial facts related at trial. For example, none of McCain's statements summarized by Officer Wright refers to one assailant's possessing a poker or ice pick, or to the stabbing of Bowman with such an instrument—a far more significant fact than the other assailant's holding a gun.

Moreover, McCain's statement to Wright that he had assisted Bowman is not "irreconcilable" with his trial testimony. The paragraph reveals that Bowman broke away from his assailants and ran toward McCain, soliciting help. McCain then grabbed Bowman momentarily to assist him before Bowman "broke loose" and ran in the direction of Claiborne's apartment. McCain then "looked back" and saw the assailants "running." In comparison, at trial McCain testified that Bowman, while the two Colemans stared at McCain, managed to rise, "run towards [McCain]," and then run into an alley. McCain then "back[ed] off," ran, and, when he "looked back," saw the Colemans "running in the same direction" as Bowman. The only difference between the two accounts is that, at trial, McCain did not mention momentarily assisting Bowman. McCain's trial testimony, however, is not "irreconcilable" with the rendering of such assistance. McCain could still have grabbed Bowman momentarily as Bowman ran toward him. Such a difference constitutes merely an omission from McCain's trial testimony, not an inconsistency. In any event, the momentary assistance was a collateral matter that did not relate to McCain's testimony that the Colemans stabbed and robbed Bowman.

In sum, the omission of a reference to a gun in Wright's summary of McCain's first statement and the omission in McCain's trial testimony of any reference to helping Bowman, as McCain apparently had told Officer Wright, do not necessarily constitute lies either to the police or to the jury. In hindsight, we cannot say there is a reasonable probability that, had Wright's witness statement been disclosed to the de-

fense earlier—thereby allowing counsel to cross-examine McCain with it—the result of the proceeding would have been different. As the trial court noted, appellants' counsel had cross-examined McCain extensively (over 115 transcript pages) on a variety of matters relating to his credibility. It is unreasonable to believe that the additional benefit afforded by impeachment on these issues would have affected the result.

### C. Recall of McCain and Cross-examination of Wright

After Officer Wright had testified on rebuttal, the trial court refused to permit the defense to recall McCain for cross-examination about the disputed paragraph in Wright's witness statement. The court also did not permit counsel to cross-examine Wright about that paragraph or about the other Jencks material; it indicated that such an inquiry lacked an adequate foundation and was beyond the scope of direct examination.

" '[The] extent of cross-examination [of a witness] with respect to an appropriate subject of inquiry is within the sound discretion of the trial court.' " *Mitchell v. United States*, 408 A.2d 1213, 1214 (D.C. 1979) (quoting *Alford v. United States*, 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931)). Likewise, recall of witnesses for additional cross-examination is a matter committed to sound trial court discretion. *Wilson v. United States*, 261 A.2d 513, 514 (D.C.1970) (per curiam); *Jackson v. District of Columbia*, 200 A.2d 199, 201 (D.C. 1964). The trial judge always can limit cross-examination to prevent inquiry into "matters having little relevance or probative value," *Springer v. United States*, 388 A.2d 846, 854–55 (D.C.1978), or where the examination becomes "repetitive, protracted or cumulative," *Hilton v. United States*, 435 A.2d 383, 388 (D.C.1981); *Brown v. United States*, 409 A.2d 1093, 1099 (D.C. 1979). Moreover, the scope of cross-examination is generally limited to matters elicited on direct examination and matters testing the credibility of a witness. *Id.* at

1099; *Waller v. United States,* 389 A.2d 801, 810 (D.C.1978), *cert. denied,* 446 U.S. 901, 100 S.Ct. 1824, 64 L.Ed.2d 253 (1980); *United States v. Stamp,* 147 U.S.App.D.C. 340, 354, 458 F.2d 759, 773 (1971), *cert. denied,* 406 U.S. 975, 92 S.Ct. 2424, 32 L.Ed.2d 675, 409 U.S. 842, 93 S.Ct. 104, 34 L.Ed.2d 81 (1972). Where extensive cross-examination has been allowed, as was the case here, reversal is warranted only when an exercise of discretion curtailing further cross-examination leads to demonstrable prejudice. *Springer,* 388 A.2d at 856; *Singletary v. United States,* 383 A.2d 1064, 1073 (D.C.1978).

■ The trial court did not abuse its discretion in refusing to allow the defense to recall McCain for additional cross-examination. As discussed earlier, the paragraph with which appellants wished to confront McCain falls far short of demonstrating that he had lied to the police or to the jury; it concerns collateral matters. Furthermore, McCain was fully and repetitively cross-examined, and his credibility was clearly called into question. "The jurors had ample opportunity to draw whatever inferences they chose regarding [McCain's] bias and credibility." *Mitchell,* 408 A.2d at 1215.

■ As to Officer Wright, defense counsel's intended inquiries into Jencks material revealing what Bowman may have told her, or about what McCain had told Wright beyond describing one of the assailants, were outside the scope of direct examination. Furthermore, defense counsel's attempts to "impeach" Wright with the information in the controversial paragraph is misplaced. Counsel did not lay a foundation showing, as he apparently wanted to, why the information in that paragraph would be relevant to a characterization of Wright as a "sloppy police officer." *See Beale v. United States,* 465 A.2d 796, 801 (D.C.1983), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984); *United States v. Wright,* 160 U.S.App.D.C. 57, 63, 489 F.2d 1181, 1187 (1973). Any effort to impeach Wright with the paragraph at is-

sue would have depended on McCain's credibility—there is irony here, to say the least—and yet McCain testified at trial that he had not told Wright what had happened, only "that I had seen it."

Apparently, what the defense was really trying to do by seeking to cross-examine Wright about the paragraph was to undermine further McCain's trial testimony by reference to his statement to Officer Wright. And yet we have concluded that the court did not abuse its discretion in refusing to permit the recall of McCain for that purpose, absent any other foundation.

### IV.

Appellant Donald Coleman contends the prosecutor's rebuttal argument was so improper that it denied him the right to a fair trial. Specifically, appellant asserts the prosecutor implied that McCain had "never lied to the police," although information in the paragraph of the police report discussed above "had to be partially a lie if McCain's trial testimony was true." Appellant also asserts the prosecutor argued that McCain's statements to Wright corroborated McCain's trial testimony, when it was "clear that his trial testimony was not [so] corroborated." Finally, appellant argues that the prosecutor misstated the facts in arguing that McCain did not "lie" to the grand jury.

■ The prosecutor's statements about which appellant complains were made in rebuttal to defense counsel's closing arguments. The propriety and import of the prosecutor's remarks, therefore, must be viewed in perspective by examining the arguments advanced by the defense, *Medina v. United States,* 315 A.2d 169, 170–71 (D.C.1974), for a prosecutor may respond, in rebuttal, to defense counsel's assertions. *Sherrod v. United States,* 478 A.2d 644, 657–58 (D.C.1984); *United States v. Monaghan,* 239 U.S.App.D.C. 275, 284, 741 F.2d 1434, 1442–43 (1984).

■ The prosecutor's comments were proper responses to defense closing argu-

ment. Defense counsel had remarked that McCain had "lied to at least" the three defense investigators, and that McCain was a "pathological liar." In response, the prosecutor acknowledged that McCain had lied to the defense investigators and argued that the reasons for doing so were understandable. He also submitted that the evidence indicated McCain had not lied to the police. Because, as explained above, McCain's trial testimony was not irreconcilable with his statement to Officer Wright—since the references to a gun in the former and to assisting Bowman in the latter were not material omissions in either—the prosecutor's argument was a fair comment on the evidence.

Next, in rebuttal the prosecutor argued that McCain's statements to Wright on the night of the killing corroborated McCain's trial testimony. Appellant disagrees. In examining the evidence that corroborated McCain's testimony, however, the prosecutor initially argued that the description Bowman had given to Claiborne of his assailant matched the description that McCain had given to Wright at Claiborne's apartment, as well as the description McCain had given to Detective Nixon two days later. The corroborating evidence, therefore, was primarily Claiborne's testi-

mony concerning Bowman's statements, and these comments were proper responses to defense counsel's arguments that McCain was the "whole case." McCain's comments to Wright concerning the description of Bowman's assailant did, in fact, match his trial testimony and, thus, did corroborate it. Apparently, appellant is arguing that the statements in the police report about McCain's assisting Bowman momentarily were so inconsistent with McCain's trial testimony that it was "unfair" for the prosecutor to refer to the other statement in the report about McCain's description of the assailant. As discussed above, however, the report was not substantially inconsistent with McCain's trial testimony and, thus, the prosecutor's comments were not improper.[11]

Finally, appellant's assertion that the prosecutor misstated the facts in asking the jury to infer McCain had never lied to the grand jury also has no merit. As discussed above, the discrepancies between McCain's grand jury testimony and his trial testimony are not material inconsistencies. Moreover, in discussing this issue with the jury, the prosecutor acknowledged that a discrepancy existed in the grand jury testimony concerning McCain's distance from

11. Appellant's reliance upon *Reichert v. United States,* 123 U.S.App.D.C. 294, 359 F.2d 278 (1966) is misplaced. In *Reichert,* one of the two identification witnesses failed to make a positive in-court identification of the defendant. During closing argument (not rebuttal), in an effort to bolster the witness's identification testimony, the prosecutor specifically highlighted Jencks statements of the witnesses, asserting that the defense had not impeached the witnesses with those statements. The statements had never been used in any manner or admitted into evidence. Moreover, the trial court compounded any prejudicial impact of the prosecutor's argument by instructing the jury that in reaching its verdict it could consider reports to the police made by identifying witnesses. Under the circumstances, the *Reichert* court found that the "clear intimation of the argument was that the prosecutor knew personally that the 'statements' were damaging and tended to corroborate the [government] witnesses." 123 U.S. App.D.C. at 298, 359 F.2d at 282. The court of appeals, therefore, held that the prosecutor had

improperly premised his argument on evidence which had not been admitted.

In this case, the prosecutor's arguments that McCain had never lied to the police or grand jury were part of the prosecutor's rebuttal argument in response to defense counsel's arguments that McCain—based on the evidence at trial—had in fact lied to these persons. The prosecutor was only urging the jury to "think back" to McCain's testimony and to draw the conclusion, based upon his testimony, that McCain, while lying to defense investigators, never in fact had lied to the police or to the grand jury. Our reading of the record does not support the conclusion that the prosecutor was implying he knew personally that evidence outside the record substantiated the assertion. As already noted, the police report was not irreconcilable with McCain's testimony. Appellants' reliance on *Reichert, United States v. Roberts,* 618 F.2d 530 (9th Cir.1980), as well as on *Johnson v. United States,* 121 U.S.App.D.C. 19, 347 F.2d 803 (1965), is unavailing.

the stabbing; he argued that the discrepancy was readily understandable and immaterial. No "misstatements" occurred.[12]

## V.

Appellants assert that the trial court abused its discretion by not declaring a mistrial, upon defense motion, after the jury on three different occasions had stated its inability to reach a verdict. We disagree.

The jury deliberated a total of nine to ten hours. It began deliberations on Friday afternoon, March 9. At 3:54 p.m., after two hours of deliberation, the jury sent the court a note stating "it appears that we are going to be unable to reach a decision." Appellant Donald Coleman requested an instruction based upon *Winters v. United States*, 317 A.2d 530 (D.C.1974) (en banc); appellant Ronald Coleman objected to such an instruction. The court denied the request and instructed the jury "it is my considered judgment that it is far too early for you to conclude that you cannot reach unanimity." The court recessed the jury until Monday. Because a juror was ill on Monday, however, the jury did not resume its deliberations until Tuesday.

After deliberating about two and one-quarter hours on Tuesday, the jury sent another note to the court. It first advised it was having "trouble determining some of the correct answers given by Mr. McCain when he testified to the grand jury"; it then asked the court whether it could see any other evidence, *i.e.*, McCain's grand jury testimony, and whether it had to find both defendants guilty if it found one guilty. It concluded by stating, "We have truly discussed this case today and we're still not united in our decision." Concern-

ing this last comment, both defense counsel suggested that the court give an antideadlock instruction. The court disagreed, saying that "given the way [the note] is communicated ... I am not prepared to say that they're telling me they're hopelessly deadlocked yet"; the court also noted that the jury had deliberated only a "little less than five hours." Accordingly, the court summarily answered the jury's three questions and instructed them to continue deliberations.

At 3:04 p.m. on Tuesday, the court received another note, in which the jury stated that it had "discussed this case as far as we feel that we can" and that "we feel that we are not going to come to a unified decision." The court advised counsel that "this is the point at which I think it makes sense to give a *Winters* charge." Both defense counsel objected, stating that such a charge would be coercive; they then moved for a mistrial. The court denied the motion, stating, "I'm giving [the instruction] because ... they have been out for seven hours, hardly an unusual amount of time in a case like this, [and] this is exactly the point at which it makes sense under our parsing of the law to give such an instruction." The court then gave the instruction.

At 5:00 p.m., the court informed counsel that it was recessing the jury's deliberations until the next day. Counsel for Ronald Coleman asked the court to inquire whether the jury was "making any progress" and, if not, to declare a mistrial. The court denied this request. At 10:30 a.m. the next day, the jury returned guilty verdicts.

Appellants claim that after receiving the third jury note the court erred in giving a *Winters* instruction instead of declaring a

---

**12.** Appellant's reliance on *Corley v. United States*, 124 U.S.App.D.C. 351, 365 F.2d 884 (1966) is also misplaced. In *Corley*, the prosecutor misstated during closing argument the testimony of a defense alibi witness, a misstatement that severely undermined the alibi defense. Appellant's counsel objected and asked that a transcript of the witness's testimony be prepared. Subsequently, the jury asked to hear that testi-

mony again. The court refused. 124 U.S.App. D.C. at 351–52, 365 F.2d at 884–85. In the present case, the jury requested the grand jury testimony of McCain. The court refused, noting correctly that the testimony had not been moved into evidence. Moreover, whatever the jury's concerns were, they were not based upon obvious misstatements by the prosecutor as in *Corley*.

mistrial. This assertion has no merit. In *Winters,* this court adopted a model instruction for situations such as this and committed use of the instruction to the sound discretion of the trial court. *Winters,* 317 A.2d at 533–34; *see Wilson v. United States,* 419 A.2d 353, 356 (D.C. 1980). On appeal, the court's ruling and an ensuing verdict may be overturned only if, from all the surrounding circumstances, it appears the *Winters* charge was coercive. *Id.* at 356–57; *Johnson v. United States,* 360 A.2d 502, 504 (D.C.1976); *see Blango v. United States,* 335 A.2d 230, 233 (D.C. 1975).

In the present case, the court's decision to give the *Winters* instruction when it did was well within its discretion and did not result in a coerced verdict. The court, in fact, exercised careful restraint before giving the instruction. After the first jury note, the court properly ordered continued deliberations without giving a *Winters* instruction. At the time of the second note—after only five hours—the jury requested additional guidance and evidence. Thus, even though the jurors indicated they were not united, it was also apparent that they had not yet deadlocked. Accordingly, the court answered the jury's questions and still did not give a *Winters* instruction. Only when the jury announced unambiguously that it was deadlocked—after approximately seven hours—did the court give the instruction. The jury then deliberated another two to three hours before reaching a verdict.

Appellant asserts that under the "unique circumstances of this case," the trial judge erred in allowing the jury to continue its deliberations after receiving the third note. Appellants have cited no precedent holding that the *Winters* instruction in such circumstances was coercive. The government cites precedent to the contrary. *See, e.g., Nelson v. United States,* 378 A.2d 657, 660–61 (D.C.1977); *Thompson v. United States,* 354 A.2d 848, 850–51 (D.C.1976). The trial court acted circumspectly in giving the *Winters* instruction. Moreover, the jury's requests for reinstruction on specific matters reveal that it discharged its duties carefully and conscientiously. The fact that it deliberated another two to three hours after receiving the instruction is a strong indication that the jurors did not surrender their will.

*Affirmed.*