**UNITED STATES, Appellant,**

v.

**Michael Eric JACKSON, Appellee.**

**No. 81–1094.**

District of Columbia Court of Appeals.

Argued Feb. 24, 1982.

Decided Aug. 16, 1982.

---

Regina McGranery, Asst. U. S. Atty., with whom Charles F. C. Ruff, U. S. Atty., at the time the brief was filed, and John A. Terry and William J. Bowman, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellant. Stanley S. Harris, U. S. Atty., Washington, D. C., also entered an appearance for appellant.

Robert P. Mosteller, Public Defender Service, with whom William J. Mertens and Arthur B. Leavens, Public Defender Service, Washington, D. C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, and KERN and BELSON, Associate Judges.

PER CURIAM:

This is a government appeal pursuant to D.C.Code 1981, § 23–104(a)(1) following a pretrial suppression hearing in which the trial court suppressed the photographic identification testimony of one witness and further ruled that it would give a *Bundy* "missing witness" instruction concerning the showing of photo arrays to two government witnesses. *See United States v. Bundy*, 153 U.S.App.D.C. 191, 194, 472 F.2d 1266, 1269 (1972) (Leventhal J., concurring). We conclude that the trial court did not abuse its discretion in suppressing this photographic identification testimony, and we further conclude that the trial court's proposed jury instruction is not properly before us for review at this time.

Appellee was charged in January 1981 in a three-count indictment with first-degree felony murder while armed, D.C.Code 1981, §§ 22–2401, –3202; armed robbery, D.C. Code 1981, §§ 22–2901, –3202; and carrying a pistol without a license, D.C.Code 1981, § 22–3204. This indictment resulted from a fatal shooting that occurred on August 8, 1980. Appellee filed motions to suppress identification testimony and statements, and, after the government filed oppositions to these motions, the trial court continued the trial to permit a hearing on appellee's motions to suppress.

At the suppression hearing, the government called three identification witnesses: Prince Shannon, Jeffrey Wayne and Mercer Simon, who were all in the vicinity of the shooting and who witnessed two men running from the scene. Simon, a former employee of the decedent's, testified that he viewed a photo array on September 3, 1980, less than a month after the crime, and that he selected the photograph of appellee, stating that it looked like one of the men who ran from the scene holding a gun. Simon also attended a lineup on November 4, 1980, where he selected appellee and another person. Although Simon was "upset" during these two identification procedures, he later testified that he was certain of his identification of appellee.

Prince Shannon, who was sitting in front of a house next door to the scene of the fatal shooting, testified that he saw two men enter the building, heard a shot, and then saw two men run out of the house. He stated that he had a five or six second opportunity to view the second man, who the government claims is appellee. Shannon recalled that he had been shown a photo array sometime in September by Detectives Robert Jackson and Warren Donald. Shannon testified that he recalled making a tentative identification of appellee as being one of the two men involved in the shooting from the array. Shannon also attended a lineup on November 4, 1980, where he identified appellee as the light-skinned man with the gun. Finally, on August 4, 1981, the day before the suppression hearing, Shannon stated that he was again shown a photo array. He recognized appellee's picture as one of the two he had earlier identified during the September photo array showing. Shannon also claimed that he recognized a filler photograph that he had seen previously, and he identified the entire array, photograph for photograph, as the one shown to him shortly after the crime.

During the government's examination of Jeffrey Wayne, he testified that he was shown a photograph of the November 4, 1980 lineup on June 30, 1981. He stated that he initially chose two people, but that he eliminated one and was sure that the

remaining person was the second man he had seen running out of the house that day. He never testified, during direct examination, that he had viewed any photographs shortly after the crime in September. This testimony was elicited only during appellee's cross-examination of Wayne, when Wayne testified that he "wasn't sure" of the photographs he had chosen at that time. Thus, the only photographic identification made by Wayne which the government offered was his selection of appellee on June 30, 1981, from a picture of the lineup which was held on November 4, 1980.

In contrast to the testimony offered by these two witnesses, Detectives Johnson and Donald testified that they had never shown photo arrays to either Shannon or Wayne shortly after the crime. These detectives were "almost positive" that they did not show such photographs to these witnesses, since it was their usual practice to take notes when photos were shown to eyewitnesses, and they had no such notes. Jackson also testified that he did not normally show photo arrays after one witness had made a positive identification, and that there had been only one array prepared for this case: the one shown to Mercer Simon at which time he made a positive identification.

After hearing this testimony and hearing arguments from counsel, the trial judge entered his very specific rulings. The trial court concluded, as a matter of fact, that the detectives had shown photographs shortly following the crime in September 1980 to Shannon and Wayne, that the detectives had made notes during these showings, and that the loss of these notes in the context of a homicide trial investigation was negligent. The court then ruled that Shannon would be precluded from testifying as to the identification he made when shown the array in September 1980, and

that he would also be precluded from testifying as to the most recent identification he had made in the prosecutor's office on August 4, 1981. (Record at 27, 30.) The court further ruled that it would instruct the jury that:

> the police failure to retain any notes with respect to the showing of any array may give rise to an inference that Mr. Shannon either made a misidentification or was unable to make any certain identification.

As to Wayne, the court ruled as admissible the identification he had made from viewing the photograph of the November 4, 1980 lineup. This was the only photographic identification by Wayne that the government offered during the suppression hearing. The government never claimed that Wayne had made an identification similar to that made by Shannon when shown photographs shortly after the offense. Thus, the only sanction imposed upon the government regarding Wayne's testimony as to the earlier photo array showing in September 1980 was the same "missing witness" type instruction applicable to Shannon.[1] The government now challenges these rulings by the trial court on several grounds, including that the trial court's finding that notes were taken during the early photo array showings to Shannon and Wayne was clearly erroneous.

Initially, we conclude that the trial court's ruling that the government's negligent loss of these notes should be sanctioned by a missing witness type instruction based upon *United States v. Bundy, supra* is not before us for review on appeal. First, a government appeal regarding jury instructions is not authorized by D.C.Code 1981, § 23–104(a)(1), since this ruling did not "suppress[ ] evidence, or otherwise den[y]

---

1. The court ruled that the photo array which was kept intact and which was shown to Simon and recognized by Shannon on the day before the hearing was not unduly suggestive. Further, although the court expressed doubts as to the accuracy of Simon's testimony, it found that the lineup of November 4, 1980, was not unduly suggestive, and subsequently ruled that

both of Simon's identifications were admissible. The court also found that Simon had an independent source for the identifications. Similarly, the court ruled as admissible Shannon's lineup identification and that he, too, had an independent source for his identification. *See Cotton v. United States*, D.C.App., 388 A.2d 865, 868–69 (1978).

the prosecutor the use of the evidence at trial ..." Further, it would be untimely for us to rule on this matter, since such instructions are subject to change as the trial develops. It is within the trial court's "sound discretion" to reshape the jury instruction or totally omit it should future circumstances require such action. *Murray v. District of Columbia*, D.C.App., 358 A.2d 651, 653 (1976). Thus, the jury instruction is not so inseparable from the preclusion of certain testimony as to make it "part and parcel" of the court's suppression order. The only question properly before us on appeal is whether the trial court abused its discretion in imposing the sanction of suppressing Shannon's photographic identifications resulting from the photo array shown to him in September 1980, and from the showing of the same array on the day prior to the suppression hearing.

The government contends that the trial court's finding that notes were taken during the photo array showing in September 1980 was clearly erroneous. The judge chose to credit the testimony of Shannon and Wayne that they were shown photos in September 1980 and chose to reject the detective's testimony that such photo arrays were never shown to these two witnesses.[2] In this instance, the trial court was properly acting as the judge of witness credibility and finder of fact; which is precisely the function of the trial court in a pretrial suppression hearing.

The record indicates that both Shannon and Wayne were unsure whether the detectives were taking notes during the photo showing. Shannon supposed that the police had notebooks with them, but did not see any. Wayne testified that he thought the police wrote down the number of the pictures he picked, "[b]ecause detectives usually do" write things down. However, the testimony offered by the two detectives establishes that, if photos were shown, they would have taken notes.

THE COURT: Would you ordinarily make any kind of notation, if you did make—show a spread to anyone else?

THE WITNESS [Jackson]: Yes, sir, either that, or my partner would make a notation.

THE COURT: But, you can't say, unequivocally, that you didn't.

THE WITNESS: I, like I say, I don't recall. I don't believe I did. No, I did not.

THE COURT: You don't believe you showed any?

THE WITNESS: Yes, because, there would be some kind of record indicating that I showed photos, and—or in my notebook, or in my partner's.

THE COURT: How long have you been in the Homicide Squad.

THE WITNESS: Eight years.

[Record at 16–17.]

Further in the proceedings, Detective Jackson testified:

Q: [Public Defender]: Again, dealing with general practice, what would have been you practice, if he would have picked out the suspect, would you have noted it down?

A: I would have noted it down, yes. [Record at 30.]

Q: [Prosecutor]: ... Is it your practice to record if a witness misidentifies in a photo spread?

A: Yes, if I show that person photos. [Record at 42–43.]

Thus, because the trial court credited Shannon and Wayne's testimony that they were shown photos shortly after the crime, the logical finding based on the detectives' own testimony is that notes of Shannon's selection of two photos, one of which was that of appellee, were indeed taken.

---

**2.** Although both Detectives Jackson and Donald testified that they did not show photographs to either Shannon or Wayne shortly after the offense, the government, through its entire argument, ignores this testimony and agrees that photographs were shown and claims that Shannon made an identification. Further, the government does not seriously challenge the trial court's finding that, if notes from these showings were taken by the officers, the loss of these notes was negligent. *See Cotton v. United States, supra* at 869–70.

■ We conclude that the trial court's finding that notes were taken during these photo array showings is amply supported by the record and is not clearly erroneous. *See Sullivan v. United States,* D.C.App., 404 A.2d 153, 156 (1979); *Brooks v. United States,* D.C.App., 367 A.2d 1297, 1302 (1976).

■ Next, assuming that the detectives took notes during these initial showings, the government argues that sanctions are inappropriate because the trial court failed to make an initial finding that these notes contained material subject to discovery by appellee. We recognize that police notes are potentially Jencks Act statements. 18 U.S.C. § 3500 *et seq.; Fields v. United States,* D.C.App., 368 A.2d 537, 541–42 (1977); *Moore v. United States,* D.C.App., 353 A.2d 16, 19 (1976); *Hardy v. United States,* D.C.App., 316 A.2d 867, 870 n.3 (1974). The mere fact that the notes are "rough" does not defeat a Jencks claim, for the form of the statement is irrelevant; the inquiry must focus on the content of the writing and on the circumstances surrounding its making. *Moore v. United States, supra* at 19–20.

■ Further, our continued emphasis upon the need for police compliance with Metropolitan Police Department General Order Series 601, No. 2, which requires preservation of notes of descriptions taken by an officer at the crime scene, establishes that such notes are potentially producible. *See Moore v. United States, supra* at 18 n.7; *Hardy v. United States, supra* at 871 (Gallagher, J., concurring); *Savage v. United States,* D.C.App., 313 A.2d 880, ˙883–84 (1974); *Banks v. United States,* D.C.App., 305 A.2d 256, 258 n.3 (1973). If identification is an issue in the case, as in the present appeal, the critical nature of notes of a description or a picture chosen during a photo array showing is clear. *See United States v. Bundy, supra* at 192, 472 F.2d at 1267.

■ The record indicates that appellee has met his burden of establishing "that there is reason to believe that a statutory 'statement' may exist." *Goldberg v. United States,* 425 U.S. 94, 124, 96 S.Ct. 1338, 1354, 47 L.Ed.2d 603 (1976) (Powell, J., concurring). To establish entitlement to an inquiry on whether such notes are discoverable as Jencks Act "statements" as defined by 18 U.S.C. § 3500(e)(2), counsel need elicit only that the witness was interviewed by an agent of the government, who made notes of the conversation.[3] *Saunders v. United States,* 114 U.S.App.D.C. 345, 348, 316 F.2d 346, 349 (1963); *Ogden v. United States,* 303 F.2d 724, 737 (9th Cir. 1962); *cf. Wilburn v. United States,* D.C.App., 340 A.2d 810, 813 (1975).

■ Here, the factual circumstances surrounding the September photo array showings to Shannon and Wayne and the taking of notes makes it quite likely that these lost notes contained potentially discoverable Jencks Act § (e)(2) statements. Whether a writing is a "substantially verbatim recital" is a question of fact which turns on whether the "statement can be fairly said to be the witness' own so that it would not be unfair to allow the defense to use it to impeach the witness." *Williams v. United States,* 119 U.S.App.D.C. 177, 179, 338 F.2d 286, 288 (1964), *citing Palermo v. United States,* 360 U.S. 343, 359, 79 S.Ct. 1217, 1228, 3 L.Ed.2d 1287 (1959). The requirement that the statement be "substantially verbatim" is a flexible one, and each statement must be examined in light of circumstances such as (1) the extent to which the writing conforms to the witness' language, (2) the length of the statement as compared to the length of the interview, (3) the lapse of time between the interview and its transcription, (4) the appearance of the substance of the witness' remarks and (5)

---

**3.** The statute provides in pertinent part:

(e) The term "statement" as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States means . . . .

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement . . . .

the purpose for which the statement was taken. *Id.* at 179–80, 338 F.2d 288–89; *Moore v. United States, supra* at 16, 18. Because the trial court did not have the notes before it to determine the nature of the recorded statements, the best indication of what the factual circumstances may have been during the showings to Shannon and Wayne is an examination of the circumstances surrounding the showing to Mercer Simon on September 3, 1980. Detective Jackson testified that Simon wrote down his exact words on the back of the photograph when the witness viewed it, and Simon testified that those words were "this is one of them." (Record at 7, 177–78.) Further, the record establishes that any statements made by Shannon during the photo array showing were "recorded contemporaneously" by the detective within the meaning of the act. (Record at 63–65).

 Relying upon the circumstances of the showing to Simon and applying the above-mentioned factors, it is likely that Shannon either wrote his statements on the back of the photographs which he identified or that one of the detectives recorded his statements, as was the custom during such an investigation. Further, recognizing that the requirement that the notes be "contemporaneously recorded" is to be interpreted flexibly, and that this standard does not require simultaneous recording, *United States v. McKeever*, 271 F.2d 669, 675 (2d Cir. 1959), we conclude that the record supports the finding that these notes were recorded properly within the meaning of § (e)(2) of the Jencks Act. A trial court's factual findings such as these will not be reversed on appeal unless such findings are without evidentiary support. *See In re J. G. J.*, D.C.App., 388 A.2d 472, 474 (1978). Since we conclude the trial court's factual findings are substantially supported by the record, we also conclude that appellee made a prima facie showing of the existence of a Jencks Act statement as defined by 18 U.S.C. § 3500(e)(2).[4]

 Further, we conclude that the trial court properly found that the government's loss of these notes in connection with a homicide investigation was "negligent." As noted in *United States v. Perry*, 153 U.S.App.D.C. 89, 95, 471 F.2d 1057, 1063 (1972), "the quest for truth . . . is undercut as much by governmental negligence as by intentional acts of destruction." *See Cotton v. United States, supra* at 870. In *United States v. Bryant*, 142 U.S.App.D.C. 132, 141, 439 F.2d 642, 651 (1971), the U. S. Court of Appeals held that "before a request for discovery has been made, the duty of disclosure is operative as a duty of preservation." *See Hardy v. United States, supra* at 870 (adopting the *Bryant* rule). Applying *Bryant*, the burden is upon the government to explain and justify the failure to preserve potentially discoverable evidence, and "the burden of explanation on the Government must be a heavy one." *Id.* at 141, 439 F.2d at 651.

 Upon conducting a hearing concerning a statement which has been lost or destroyed, the trial court must consider (1) who within the government is responsible for the loss or destruction; (2) whether the loss or destruction was deliberate, done for an improper purpose, negligent or inadvertent; (3) the extent to which the government has promulgated and generally followed procedures designed to preserve evidence, *United States v. Augenblick*, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969); (4) whether the applicable procedures were followed in the particular case; and (5) what steps were taken by the government to locate or reconstruct the missing evidence when its loss was discovered. *See, e.g., Johnson v. United States*, D.C.App., 336 A.2d 545 (1975). The record supports the conclusion that these considerations were taken into account in this particular instance. Therefore, we further conclude that there was a sufficient basis for the trial court's determination that the loss of notes in these circumstances constituted negligence.

---

4. We thus find it unnecessary to determine whether these notes were discoverable pursuant to Super.Ct.Cr.R. 16 or the doctrine enunciated in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

We also conclude that the trial court did not abuse its discretion in imposing the sanction of suppression of Shannon's photographic identifications. We recognize that violation of the government's duty resulting in the loss of producible statements does not automatically require the imposition of the sanctions provided for in 18 U.S.C. § 3500(d). *Fields v. United States, supra* at 541; *Jones v. United States,* D.C.App., 343 A.2d 346, 352 (1975). A trial court must examine the "totality of the circumstances" in determining what sanction to apply. *Montgomery v. United States,* D.C.App., 384 A.2d 655, 662 (1978). The degree of negligence involved is especially significant to a determination of the appropriate sanction. Where the loss is a result of bad faith or gross negligence, the trial court must exclude the witness' testimony. *Johnson v. United States,* D.C.App., 298 A.2d 516, 520 (1972).

Here, we conclude that the court's decision to preclude Shannon's photographic identifications due to the government's negligent loss of the notes taken during the initial photo spread showing shortly after the crime was an appropriate sanction within the proper exercise of the trial court's discretion. *See Fields v. United States, supra* at 540; *March v. United States,* D.C. App., 362 A.2d 691, 702 (1976).[5]

Finally, we conclude that the trial court did not exceed its statutory authority by imposing this sanction prior to trial, since Jencks material is clearly producible at a pretrial hearing, and an appropriate

sanction for the negligent failure to produce such evidence must necessarily be available. *See generally, Cotton v. United States, supra* at 868–69; *Savage v. United States, supra* at 882–83; *United States v. Dockery,* D.C.App., 294 A.2d 158, 160–64 (1972); *cf. United States v. Anderson,* D.C. App., 366 A.2d 1098, 1100 (1976).[6]

The procedure applied in this case is precisely that anticipated in cases such as *Cotton,* where there is nonpreservation of evidence which is discovered during a pretrial suppression hearing.[7] Of course, if the government should discover the lost notes, the court could reconsider its order. The availability of pretrial sanctions upon a finding by the trial court of a violation of the Jencks Act is consistent with the intent of the statute as well as our numerous holdings which describe the deference to be accorded to the exercise of the trial court's discretion in imposing sanctions in these circumstances. *See generally, Cotton, supra; Montgomery, supra; Fields, supra.*

We conclude that *Dockery* clearly contemplates the availability of pretrial sanctions such as those imposed in this case, and we accordingly affirm.

*Affirmed.*

---

5. We reject the government's argument that a showing of prejudice to appellee caused by nonproduction is a prerequisite to the imposition of any sanction. The Jencks Act itself imposes no requirement that the defendant show that prejudice results from the failure to produce. *See United States v. Jencks,* 353 U.S. 657, 674–77, 77 S.Ct. 1007, 1016–18, 1 L.Ed.2d 1103 (1957); *cf. Reed v. United States,* D.C. App., 379 A.2d 1181, 1183 (1977) (once material sought is determined to be a "statement" there is to be no balancing of government and defense interests).

6. For example, in emphasizing the importance of early pretrial discovery, the U. S. Court of Appeals for the District of Columbia Circuit recently criticized the government for withholding Jencks material until the outset of a suppression hearing held on the morning before trial. *United States v. Hinton,* 203 U.S.App. D.C. 187, 197–98, 631 F.2d 769, 779–80 (1980).

7. Upon the discovery of the government's failure to preserve Jencks material during a pretrial suppression hearing, we believe that the imposition of sanctions at that time is an orderly and efficient procedure. Such a ruling in advance of trial gave the government an opportunity to appeal which it might not otherwise have had. Further, as pointed out *infra,* if the government should discover the notes during the trial, the trial court retains the discretion to modify its pretrial order.