*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-0235

ANTHONY ANTWONE WATERS, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2010-CF1-011710)

(Hon. Craig Iscoe, Trial Judge)

(Argued June 7, 2022      Decided September 28, 2023)

*Matthew B. Kaplan* for appellant.

*Samia Fam*, *Shilpa S. Satoskar*, and *Stefanie Schneider*, Public Defender Service, filed a brief as *amicus curiae* on behalf of appellant.

*Michael E. McGovern*, Assistant United States Attorney, with whom *Channing D. Phillips*, Acting United States Attorney at the time, and *Chrisellen R. Kolb*, *Suzanne Grealy Curt*, and *S. Vinet Bryant*, Assistant United States Attorneys, were on the brief, for appellee.

Before DEAHL and HOWARD, *Associate Judges*, and GLICKMAN, *Senior Judge*.*

---

* Judge Glickman was an Associate Judge of the court at the time of argument. He began his service as a Senior Judge on December 21, 2022.

DEAHL, *Associate Judge*:   Anthony Waters was convicted of first-degree murder and related offenses in 2012.  Waters successfully attacked those convictions in a pro se § 23-110 motion where he argued that his trial counsel was ineffective. As part of the ensuing proceedings, the trial court directed Waters's trial counsel to disclose any documents "that relate to [Waters's] specific post-conviction ineffective assistance of counsel claims" and authorized him to discuss his representation with the government.  The trial court ultimately vacated Waters's convictions due to his trial counsel's ineffectiveness.

At Waters's retrial, the government sought to introduce defense investigator memoranda memorializing interviews with defense witnesses that the earlier defense counsel had disclosed during the § 23-110 proceeding.  Waters moved to preclude the government from doing so, arguing that the disclosures were protected by the work product privilege, and to the extent he waived that privilege in the course of litigating his ineffective assistance of counsel claim, he argued that his waiver was a limited one that did not permit the government to make use of the evidence at his retrial.  The government countered that defense counsel would have been required to disclose the memos, regardless of their disclosure in the § 23-110 proceedings, to comply with its obligations under the Jencks Act.  The trial court agreed and allowed the government to impeach two defense witnesses with defense investigator memos

that had been disclosed in the § 23-110 proceedings, recounting investigator conversations with each witness. The trial court reasoned that those memos were required disclosures under the Jencks Act, even if they were otherwise privileged, because each was a "substantially verbatim, contemporaneously recorded recital of the witness's oral statement," *see* Super. Ct. R. Crim. P. 26.2(f). Waters was again convicted of first-degree murder and related offenses and now appeals.

Waters contends in this appeal that the trial court committed reversible error by permitting the government to impeach his witnesses with the defense investigator memos disclosed in the earlier § 23-110 proceeding. He argues that the memos were not substantially verbatim contemporaneous recordings, so that they did not need to be disclosed under the Jencks Act. And he maintains that he did not otherwise waive the work product doctrine's protections when his initial trial counsel disclosed defense materials as part of the § 23-110 proceedings. We agree with Waters in both respects, but ultimately conclude that the errors here were not harmful and so do not merit reversal. We also disagree with Waters's argument that a potentially improper line of government questioning at his retrial warrants reversal of his convictions. We therefore affirm.

## I. Background

*The First Trial*

In June 2010, Derrick Harris was shot and killed on the 2600 block of Birney Place in Southeast D.C.'s Parkchester neighborhood. Waters was charged with first-degree murder and related weapons offenses. He was initially represented by an attorney from the Public Defender Service ("PDS"), but about a year into PDS's representation, the court removed PDS and appointed Dorsey Jones as counsel. Jones represented Waters at his first trial.

Central to the government's case at that first trial was the testimony of three eyewitnesses who lived on Birney Place: Lisa Ruth, Cedrica Sibley, and Mary Goode. Their testimony can be summarized as follows. Lisa Ruth testified that she was in her third-floor apartment on Birney Place when she heard raised voices outside. She went downstairs and saw Waters and Harris arguing. Waters punched Harris in the face and threatened to kill him. Two other men—Tyrone Turner and Lorenzo Moore—were trying to calm the situation down. Ruth testified that she went back upstairs and, about an hour later, heard a gunshot. She went to her window and saw Harris lying on the ground struggling to crawl away as Waters shot

him three or four times. Waters was wearing a white tank top, khaki shorts, and a black facemask with the eyes and mouth cut out, though Ruth still claimed to recognize him from his skin tone and build. Ruth knew Waters because he used to live in the building across the street from her, and she testified she would see him with his friends every other day and she knew him by sight. Ruth did not know his real name, but instead knew him by his nickname, Red. Ruth gave police a statement in which she told them Red was the shooter, and she identified Waters as Red from a photo array.

Ruth's daughter, Cedrica Sibley, corroborated Ruth's account except that Sibley herself did not know or identify Waters. Sibley testified that she was sitting outside her mother's apartment that day when she saw a light-skinned man in a white tank top and light brown khaki shorts, with a black cap on his head, peeking out from behind a building across from where she was sitting. She saw Turner and Harris pull up in a truck. As Turner and Harris walked away from the vehicle, the man who had been peeking out from behind the building came running at Harris, with the black cap now pulled down over his face, and shot Harris four times.

Mary Goode testified that she had no trouble seeing the shooter's face, and that he was Waters. Goode said she was in her apartment when she heard arguing.

She heard Harris and Turner's voices, along with the voice of a third man, which she did not recognize. A few minutes later, she heard gunshots. She looked out her window and saw a body lying on the sidewalk, with a man walking away from it. The man was wearing a white t-shirt and tan shorts, and a black mask (with the eyes and mouth cut out) was covering his face. As he turned the corner and walked down a set of steps toward a street adjacent to Birney Place—Wade Road—he took off his mask, and Goode recognized the man to be Waters. Goode had known Waters (whom she called Red) for five or six years. She often saw him around the neighborhood and she recognized him by sight. Goode initially told police she could not see the shooter's face because, she testified, she was afraid to get involved. But she later called the police and identified Red by name as the shooter, and selected him in a photo array.

The government also introduced a videotape of Waters's post-arrest interrogation. In that interview, Waters provided alibis for the window of time when Harris was killed, shortly before 9pm. He claimed he was at home (on Wade Road, near the shooting) with his roommate, Shirley Mills, from 8:30 to 9:30pm, and then he left the area to go visit his daughter until after 10:30pm. The government introduced evidence that these were lies. First, they called Mills who testified that Waters had left their shared apartment the afternoon before the murder, and he had

not returned by the time Mills received a call from a friend saying she heard the gunshots attendant to Harris's murder. The government presented cellphone records indicating that Waters's daughter called him six times between 8:30 and 10:30pm that night, suggesting that they were not together at the time. The government also introduced geolocation data showing that Waters's cell phone was near Birney Place and in the vicinity of the murder when it took place.

The defense argued that Waters had been misidentified and called a single witness at the initial trial. That witness testified that he had seen Waters mere seconds after the shooting sitting by a mailbox on Wade Road, down the steps from where Harris was killed.

The jury convicted Waters of all counts. We affirmed Waters's convictions on direct appeal. *Waters v. United States*, No. 12-CF-388, Mem. Op. & J. (D.C. Oct. 8, 2015).

### The § 23-110 Proceedings

Waters brought a pro se ineffective assistance of counsel claim under D.C. Code § 23-110, asserting that Jones had failed to introduce the testimony of several

exculpatory witnesses.  The government sought access to Jones's defense files, so that it could defend against the ineffective assistance claim.  The trial court granted this request and issued an order directing that "the attorney-client privilege, as it applies to Dorsey Jones, Esq., in relation to the specific matters raised by the defendant in his D.C. Code § 23-110 motion alleging ineffective assistance of trial counsel, is waived" and authorizing Jones "to disclose to the United States any documents in his possession that related to" Waters's claims.  This included defense files that Jones had inherited from PDS when he took over the case.

Waters was then appointed counsel and the court held a hearing on his claim, after which the court concluded that Jones had provided ineffective assistance by failing to call several witnesses who could have undermined the government's case and strengthened Waters's alibi defense.  The court vacated Waters's convictions.

*The Second Trial*

The government retried Waters and presented largely the same evidence as it had in the first trial, though Goode had died prior to the retrial so her prior sworn testimony was read aloud to the jury.  The defense again argued misidentification, but this time it called multiple witnesses in support of that defense.

Among the defense's new witnesses were Latrice "Keke" Williams, Lorenzo Moore, and Perez Green. Williams testified that she was with Waters when shots were fired, on or near Wade Road (not up the steps on Birney Place, where the shooting occurred). Moore's testimony was less than exculpatory: he testified that he saw Waters walking up the steps from Wade Road to Birney place about three to five minutes after the shooting. Over defense counsel's objections, and as detailed further below, the government impeached both Williams and Moore with memos written by PDS investigators who had interviewed them in the months after the shooting. The government had copies of those memos only because they were part of the defense files that Jones disclosed during the § 23-110 proceedings. The government also called the PDS investigators who had written the memos to complete the impeachment.

Green testified that he had seen Turner (but not Waters) arguing with Harris earlier that day, though Green testified that he did not see the murder. The prosecutor, on cross examination and over defense objection, asked Green whether he "remember[ed] telling" the prosecutor that Waters "came through the cut and shot [Harris]." Green denied making such a statement. The defense then asked to review the prosecutor's notes from that meeting with Green and renewed its objection on the basis that, even if Green had said that to a prosecutor, there was no indication

that he was speaking from firsthand knowledge (as opposed to relaying hearsay that Waters shot Harris). The trial court took no curative measures because Green denied making the statement, and the prosecutor's question was not evidence. Nonetheless, the government later, and still over defense counsel's objections, elicited testimony from a police detective that he had heard Green say that Waters killed Harris. Once again defense counsel pointed out that there was no indication Green was speaking from firsthand knowledge as opposed to relaying hearsay, and while the government claimed that Green had previously indicated he saw the murder, the trial court struck the detective's testimony without resolving the issue. It instructed jurors that "you'll pay no attention to that statement by the detective, and you'll rely on what you understood Perez Green to say when he testified."

The jury convicted Waters on all counts and Waters was sentenced to life imprisonment. Waters now appeals.

## II. Jencks and Work Product

Waters first argues that the trial court erred in allowing the government to impeach Williams and Moore using defense investigator memos disclosed during the § 23-110 proceedings. To succeed on this argument, Waters needs to clear two

hurdles: (1) he needs to show that the trial court abused its discretion when it ruled that the memos were Jencks material under Rule 26.2, which would have to be disclosed even if the memos were otherwise covered by work product protections; (2) if the trial court did abuse its discretion in that regard, Waters would then need to establish that he did not waive the protections for attorney work product during the § 23-110 litigation. Before considering those arguments in turn, we provide a more extensive background related to this claim.

## A. Additional Background

Waters called Williams and Moore as alibi witnesses at his retrial. Williams testified that she was standing outside on Wade Road by some mailboxes with Waters when she heard the first shot. She then ran inside and heard several more shots. On cross-examination, and over defense objections, the government confronted Williams with a memo written by Amanda Krut, a PDS investigator who had interviewed her about three months after the killing. That memo had been disclosed to the government in Waters's earlier § 23-110 proceedings. Williams testified that she did not recall speaking to Krut. The government then called Krut, who confirmed that she had spoken to Williams and had written a summary of their conversation in a memo, which made no mention of Williams being with Waters at

the time of the shooting. Krut testified that she did not take notes during the interview and that she wrote the memo later the same day. She testified that she had not shown Williams the memo after writing it.

Krut's memo states that Williams was hanging out with Waters at her apartment on the day of the shooting. At some point in the evening, they went outside behind her apartment building to smoke. They parted ways around 9:30pm, when Waters left to go see his daughter. Nowhere does the memo state that Williams heard shots, or that she was with Waters when she did. On this basis, the government argued in closing that Williams was fabricating her testimony that she was with Waters when she heard the first shot.

Moore also testified for the defense at Waters's retrial, though it would be a stretch to say he provided any alibi at all. Moore testified that he was inside his apartment building on Birney Place when he heard the shots. Three to five minutes later, he went to his window and saw Waters walking up the steps from Wade Road and coming toward Birney Place. Moore then walked out of his apartment building and met Waters at the top of the steps.

The government impeached Moore with a memo written by PDS investigator

Michelle Eidell memorializing her interview with him. That memo stated that Moore had not seen anyone when he looked out his window after the gunshots, but then saw Waters when he left his apartment building immediately thereafter. Moore testified that he recalled speaking with Eidell but had told her that he had seen Waters both when he looked out of his window and when he left his apartment building. The government called Eidell, who confirmed that she had recorded her interview with Moore in the memo. She testified that she did not take notes during the interview and that it was in fact PDS policy not to take contemporaneous notes during witness interviews; rather, she had typed up the memo from memory later that day. She also testified that Moore had not reviewed the memo for accuracy. The government argued in closing that Moore was not a credible witness, in part because of the discrepancy between the Eidell memo and his trial testimony as to whether he had seen Waters when he looked out the window.

The defense strenuously objected to the government's use of the PDS memos to impeach Williams and Moore, as well as the fact that the government called the PDS investigators to complete their impeachment. According to the defense, the memos constituted attorney work product and were therefore privileged. The government argued that the memos had to be disclosed because they were substantially verbatim and contemporaneously recorded witness statements under

the Jencks Act/Rule 26.2. The government also argued that Waters had waived any privilege claim when his earlier counsel gave the documents to the government during the § 23-110 proceedings. The defense countered that the statements were neither substantially verbatim nor contemporaneously recorded, as Rule 26.2 contemplates, and that the waiver of privilege was limited to the § 23-110 proceedings and so did not permit the government to use the memos at the subsequent trial.

The trial court focused on the Krut memo and found it to be Jencks material. The court determined that the two paragraphs of the memo that detailed Krut's meeting with Williams "appeared to . . . be a contemporaneous writing or made from a contemporaneous writing and notes" and that "they were extraordinarily detailed [and] appeared to repeat verbatim what the witness had said." The court made this determination solely on the basis of the memo itself, without considering any extrinsic testimony or evidence. Though the court did not explicitly consider the contents of the Eidell memo, it spoke, in its ruling, of defense investigators (plural), implying that it considered both memos to be Jencks material. Because this finding sufficed to justify the government's use of the memos, the court did not decide whether the defense's privilege waiver during the § 23-110 proceedings extended to the second trial.

## B. The Jencks Act

Waters first argues that the trial court abused its discretion when it concluded that the defense was required to turn over the investigator memos under Rule 26.2, which implements the Jencks Act, 18 U.S.C. § 3500. *Hernandez v. United States*, 129 A.3d 914, 919 (D.C. 2016). Rule 26.2 provides:

> After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, must order an attorney for the government or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

Super. Ct. R. Crim. P. 26.2(a). As critical here, Rule 26.2 then defines a "statement" as including "*a substantially verbatim, contemporaneously recorded* recital of the witness's oral statement that is contained in any recording or any transcription of a recording." Super. Ct. R. Crim. P. 26.2(f)(2) (emphasis added). When it is the government seeking disclosure of defense witness statements under Rule 26.2, we often refer to that as "reverse Jencks" material. *See, e.g.*, *Frye v. United States*, 600

A.2d 808, 810 (D.C. 1991).

Because "[t]rial courts have 'considerable discretion' in administering the Jencks Act," we review Jencks Act determinations for abuse of discretion. *Hernandez*, 129 A.3d at 919 (quoting *Johnson v. United States*, 800 A.2d 696, 699 (D.C. 2002)).[1]  We conclude that the trial court abused its discretion in concluding that the memos were Jencks material, both because they only summarized witness accounts and because they were not contemporaneous written recordings of the statements.

Summaries "rarely, if ever" satisfy the Jencks Act's substantially verbatim

---

[1] The Public Defender Service argues as amicus that we ought to review the trial court's Jencks determination de novo.  It premises its argument on our statement in *Hernandez* that while "the Supreme Court has treated [the substantially verbatim inquiry] as predominantly factual in nature, the line between notes that are substantially verbatim and notes that are not is *to a degree* a legal question."  129 A.3d at 922 (emphasis added) (citation omitted).  That is surely true, but it does not transform our review into a de novo one.  Whether statements are "substantially verbatim" and sufficiently "contemporaneous" to require disclosure under Rule 26.2 are, to a degree, judgment calls left to the trial court's discretion.  While we police those discretionary judgments to make sure that they are reasonable, and will find an abuse of discretion when the trial court "applies an incorrect standard of law or grants relief on the basis of findings of fact that are unsupported by the record," *see Oxendine v. Merrell Dow Pharms., Inc*., 563 A.2d 330, 334 (D.C. 1989), we do so under our well-established abuse of discretion standard applicable to these claims.

requirement. *March v. United States*, 362 A.2d 691, 700 (D.C 1976); *see also Coleman v. United States*, 515 A.2d 439, 447 (D.C. 1986) (explaining that, under the Jencks Act, "summaries of an oral statement . . . are not to be produced" (emphasis and citation omitted)). The Jencks Act requires a "rigorous" "degree of completeness" not satisfied by "typical interview notes." *March*, 362 A.2d at 700, 701 n.18 (quoting *Goldberg v. United States*, 425 U.S. 94, 126 (1976) (Powell, J., concurring)). To be Jencks material, notes "must be a continuous, narrative recording rather than mere selective notations or excerpts from the oral statements." *Simms v. United States*, 634 A.2d 442, 447 n.3 (D.C. 1993) (quoting *Moore v. United States*, 353 A.2d 16, 18 (D.C. 1976)). The Jencks Act requires this degree of completeness because "it was felt to be grossly unfair to allow [a party] to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations, and interpolations." *Palermo v. United States*, 360 U.S. 343, 350 (1959).

In assessing whether a statement is substantially verbatim, courts should examine "(1) the extent to which the writing conforms to the witness' language, (2) the length of the statement as compared to the length of the interview, (3) the lapse of time between the interview and its transcription, (4) the appearance of the substance of the witness' remarks and (5) the purpose for which the statement was

taken." *United States v. Jackson*, 450 A.2d 419, 425-26 (D.C. 1982).

We focus, as the trial court did, on the Krut memo. That memo begins: "On September 9, 2010 at 4:15pm intern investigator Charlie Clark and I arrived in the area of 2646 Birney Place SE in order to speak with Ms. Keke [Williams]" and others. It describes how Krut approached two men and spoke with them briefly, and then approached a woman who turned out to be Williams. The memo then memorializes how Krut introduced herself to Williams, explained that she worked for PDS, and asked to speak with her. The next paragraph describes Williams's appearance, and the following two paragraphs summarize Krut's conversation with Williams. Those paragraphs begin: "I learned from Ms. Keke that Anthony Waters had spent a lot of time hanging out with her during the month of June. On the 14th in particular, she remembers that her and Anthony had hung out during the day." And the remainder of the memo continues in that vein.

The face of the memo does not suggest that it is a substantially verbatim reproduction of what Williams said. Quite the opposite. The memo is written in the past tense, talking about Williams in the third person. It is organized into themed paragraphs. The language is not that of a person having a conversation: it is written in full sentences, with no redundancies, no use of slang, and no other imperfections

characteristic of unscripted spoken conversation. The memo also contained errors that Williams herself was not likely to make: for instance, it incorrectly described Waters's daughter as Williams's niece, even though she is not.

The memo contains several other clear indications that it is a summary of a conversation, rather than a true or approximate transcription of one. *See Coleman*, 515 A.2d at 447. The narrative synthesizes large periods of time into succinct sentences (e.g. "At some point they separated and she did not see him until later that day."). It also dedicates less than 400 words to the conversation with Williams. While the government points out that this was a "less than thirty-minute interview," people tend to speak that number of words in closer to three minutes. *See* Lisa J. Steele*, Organizing Information and Taking Notes for Criminal Cases*, THE CHAMPION, July 2017, at 14, 15 ("A typical person speaks at 125 words per minute."). And the two paragraphs describing the interview with Williams must be read in the context of the memo as a whole, in which Krut describes who she was with, whom she planned to speak to, and the sequence of events leading up to her discussion with Williams—the type of framing characteristic of a summary. The trial court's conclusion that this was a substantially verbatim transcription of Williams's statement is unsupported by the record.

We could stop our analysis here, as a statement needs to be both substantially verbatim and contemporaneously recorded to qualify as Jencks material. But we further conclude that the trial court had an insufficient factual basis to rule that Krut's memo was contemporaneously recorded. *See Hummer v. Levin*, 673 A.2d 631, 636 (D.C. 1996) ("[T]he trial court abuses its discretion if it . . . [rules] on the basis of findings of fact that are unsupported by the record." (quotation omitted)).

Summaries that "were prepared after the interview without the aid of complete notes, and hence rest on the memory of the agent," are not Jencks material. *Palermo*, 360 U.S. at 352-53; *see also Coleman*, 515 A.2d at 447 (explaining that even though the summary contained what purported to be a direct quote, the fact that the report was written from memory, two days later, meant it was not Jencks material). The trial court found that Krut's memo was typed up with the aid of contemporaneous notes because the relevant paragraphs were "extraordinarily detailed," "appear[ed] to [the court] to be verbatim statements" and contained no commentary. As explained above, the record does not support the finding that these were extraordinarily detailed paragraphs comprised of Williams's verbatim statements. And the lack of commentary—such as Krut opining on Williams's seeming veracity—is of little moment. We suspect that investigators often aim to collect and memorialize just the facts, rather than inserting their own opinion. While

commentary could certainly suggest that a memo was recorded after the fact, its absence does little to show that it was recorded contemporaneously. *See Coleman*, 515 A.2d at 447 (finding summary of witness conversation that contained no commentary was not Jencks material). Indeed, while the trial court's ruling preceded this, Krut's unchallenged trial testimony indicated that she did not take any notes during her interview of Williams, per PDS policy, and did not record her recollections of the conversation until sometime later that day.

The government counters that even assuming Krut took no contemporaneous notes and wrote her memo some hours after the interview—as suggested in her testimony—it remains a contemporaneous recording because the contemporaneity requirement "is to be interpreted flexibly." But this stretches even a "flexible" interpretation of the term "contemporaneous" past its breaking point. In *United States v. Jackson*, the case the government relies on, we considered whether lost notes of a witness's statements during a photo array were Jencks material. 450 A.2d 419, 425-27 (D.C. 1982). Acknowledging that the contemporaneity requirement was flexible and did not require the recording to be simultaneous, we concluded that the notes were Jencks material because it was likely either that the witness "wrote his statements on the back of the photographs which he identified or that one of the detectives recorded his statements, as was the custom during such an investigation."

*Id.* at 426. When we spoke of flexibility, then, we were referring to the fact that the statements could have been recorded moments after they were spoken, either by the witness or by the officers. There was no suggestion that the statements might have been recorded hours later, and we have never said that a recording that long after the fact is still considered contemporaneous.

In sum, the court abused its discretion in concluding that the Krut memo was Jencks material: the memo was neither substantially verbatim nor contemporaneously recorded.

The same is true, and for much the same reasons, of the Eidell memo. Like the Krut memo, it begins by describing the context of the investigation: "I traveled to Bernie Place, SE to canvass for witnesses . . . . I began in building 2643 . . . . I spoke with the following individuals, all of which advised that they had no information about this case." After describing her interactions with about six different people, the memo turns to Eidell's conversation with Moore. It summarizes their conversation succinctly, in full sentences, with no imperfections characteristic of spoken conversation—like the Krut memo. In addition, the Eidell memo contains some editorializing, as in the following excerpt: "[Moore] said that he saw Dirty (client) shortly after the shooting walking up the path on the left (if you are looking

at 2632 from 2645) from the area of Wade Rd, SE. I believe this is while [Moore] was looking for his daughter." Only Eidell would describe Dirty (a nickname for Waters) as "client" and it is apparent that she is the one who is guessing that Waters was looking for his daughter. Therefore, the Eidell memo is, similarly, not Jencks material.

### C. Waiver of the Attorney Work Product Privilege

Because we conclude that the memos did not have to be disclosed by the defense as reverse Jencks material, we must address the question bypassed by the trial court: whether the prosecution could introduce the defense memos because Waters's earlier attorney had produced them during the § 23-110 proceedings and thereby waived any work product privilege as to them. This raises a question of first impression that we review de novo. *In re Pub. Def. Serv.*, 831 A.2d 890, 897-98 (D.C. 2003).

The leading case on this question is *Bittaker v. Woodford*, (9th Cir. 2003) (en banc), and every court to have considered this issue seems to agree with *Bittaker*'s

approach.[2]  As the Ninth Circuit explained in *Bittaker*, a litigant implicitly "waives the attorney-client privilege by putting the lawyer's performance at issue during the course of litigation."  *Id.* at 718-19.  Over time, courts have come to refer to this common law rule as "the fairness principle," as it prevents a litigant from "asserting claims the opposing party cannot adequately dispute unless it has access to the privileged materials."  *Id.* at 719.

But because a defendant's implicit privilege waiver is rooted in fairness to the party opposing a claim, it does not extend to "all time and all purposes—including [] possible retrial."  *Id.* at 717.  In *Bittaker*, the Ninth Circuit held that the defendant's waiver extended only to the federal habeas proceedings in which it arose, noting "that the court must impose a waiver no broader than needed to ensure the fairness of the proceedings before it."  *Id.* at 720-24.  There, the government appealed a trial court's protective order that precluded the government from using privileged

---

[2]  *See, e.g.*, *In re Lott*, 424 F.3d 446, 453 (6th Cir. 2005); *United States v. Pinson*, 584 F.3d 972, 978 (10th Cir. 2009); *People v. Ledesma*, 140 P.3d 657, 688-701 (Cal. 2006) (limiting the use of privileged psychiatric communications to the habeas proceeding because "the disclosure of confidential communications at the habeas corpus hearing can be attributed to the [trial] attorney's ineffective assistance"); *Kaur v. State*, No. 2516, 2019 WL 2407997, at *12-14 (Md. Ct. Spec. App. June 7, 2019) (adopting *Bittaker*'s limitations on the scope of the waiver despite the absence of a pre-disclosure protective order).  The government has pointed to no case to the contrary.

materials for any reason other than litigating the federal habeas petition at hand. *Id.* at 717. The Ninth Circuit affirmed, reasoning that if a person prevails on an ineffective assistance claim, "the court should aim to restore him to the position he would have occupied, had the first trial been constitutionally error-free" and that "[g]iving the prosecution the advantage of obtaining the defense casefile—and possibly even forcing the first lawyer to testify against the client during the second trial—would assuredly not put the parties back at the same starting gate." *Id.* at 722-23. The court held that a failure to enter such a protective order would have been an abuse of discretion. *Id.* at 728. The court also noted that even though its "decision [was] couched in terms of the attorney-client privilege, it applies equally to the work product privilege, a complementary rule that protects many of the same interests." *Id.* at 722 n.6 (citing *Upjohn Co. v. United States*, 449 U.S. 383 (1981)).

While the court presiding over the § 23-110 proceedings here did not preemptively issue a protective order like the one in *Bittaker*—Waters was proceeding pro se at the time the trial court directed disclosure—that procedural nuance does not counsel in favor of a different result here. *See United States v. Nicholson*, 611 F.3d 191, 216-17 (4th Cir. 2010) (finding that even in the absence of a protective order, attorney's testimony about defendant's confidential statements to him could not be used at resentencing). The Supreme Court has stated that it is

"intolerable that one constitutional right should have to be surrendered in order to assert another." *Simmons v. United States*, 390 U.S. 377, 394 (1968); *see also Bittaker*, 331 F.3d at 723 n.7 ("[I]t would be constitutionally unacceptable to require a criminal defendant to choose between two constitutional rights." (emphasis omitted)). The work product doctrine is an evidentiary doctrine, not strictly a constitutional right, but it has a constitutional valance. *See In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 174 (4th Cir. 2019) ("[T]he work-product doctrine fulfills an essential and important role in ensuring the Sixth Amendment right to effective assistance of counsel."); *United States v. Nobles*, 422 U.S. 225, 238 (1975) (work product doctrine is "vital" and "assur[es] the proper functioning of the criminal justice system"). And a defendant does not surrender the work product privilege by vindicating their constitutional right to effective assistance of counsel, except in the limited context of that collateral proceeding itself.

Work product protections, like the attorney-client privilege, protect criminal defense attorneys' ability to zealously represent their clients. Without those doctrines, "attorneys representing criminal defendants . . . would have to worry constantly about whether their casefiles and client conversations would someday fall into the hands of the prosecution," thereby "inhibit[ing] the kind of frank attorney-client communications and vigorous investigation of all possible defenses that the

attorney-client and work product privileges are designed to promote." *Bittaker*, 331 F.3d at 722. "[D]oing away with [work product or attorney-client] privilege in all criminal cases would raise a nontrivial question whether defendants would still be getting effective assistance." *Id.* at 723 n.7. Allowing the government access to "every statement [the defendant] made to his first lawyer,"—which would ordinarily be protected by the attorney-client privilege—would unfairly force defendants to choose between risking a retrial severely skewed by the government's access to the privileged contents of his first counsel's casefile and forgoing a challenge to what may have been constitutionally defective assistance. *See id.* at 723 (citing *Simmons*, 390 U.S. at 394). The same is true of work product protections: if the government had access to the whole defense casefile, the defendant would be forced to choose between a compromised retrial and forgoing a challenge to effective assistance. In other words, when forced to choose between work product privilege and the ability to challenge effective assistance of counsel, "the right to a fair trial hangs on each side of the scale." *Id.* at 723 n.7.

The government suggests that *Bittaker*'s reasoning should not extend to these facts, but we are unpersuaded. First, the government argues that because the memos became part of the public record through testimony during the § 23-110 proceedings,

they were fair game at retrial.[3] The flaw with this argument is that it would render *Bittaker*'s logic toothless, as the government could turn the entire defense record into evidence at retrial by simply introducing it at the § 23-110 proceedings. *See Lambright v. Ryan*, 698 F.3d 808, 820 (9th Cir. 2012) (holding that *Bittaker* extends to protected information that became part of the public record during an ineffective assistance hearing because to hold otherwise would make the protective order "practically useless").

Second, the government argues that its use of the memos was permissible because they were used only to impeach the witnesses, not as an affirmative part of the government's case. *Bittaker* did not concern impeachment specifically, though it did approve a protective order that forbade the government from using the "privileged materials *for any purpose* other than litigating the federal habeas

---

[3] In a related argument, the government argues that the memos were "fact work product," not "opinion work product," and were therefore not privileged at all. *See Hickman v. Taylor*, 329 U.S. 495, 511 (1947) (delineating the two types of work product and explaining that fact work product is easier for an opposing party to discover than opinion work product). We disagree. The Supreme Court has made clear that *Hickman*'s examples of "nonprivileged facts . . . did not apply to 'oral statements made by witnesses . . . whether presently in the form of [the attorney's] mental impressions or memoranda.'" *Upjohn*, 449 U.S. at 399 (quoting *Hickman*, 329 U.S. at 512). "Forcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes." *Id.* at 399.

petition." 331 F.3d at 717. Even still, the government argues that *Bittaker*'s rationale should not extend to the impeachment use of otherwise privileged communications, analogizing to certain exclusionary rule contexts in which the Supreme Court has held that the government may use evidence obtained in violation of a defendant's constitutional rights to impeach a defendant's testimony. *See e.g.*, *Kansas v. Ventris*, 556 U.S. 586 (2009) (statement elicited in violation of "prophylactic" Sixth Amendment protection to have counsel present at police interrogation could be admitted as impeachment); *Harris v. New York*, 401 U.S. 222, 226 (1971) (permitting impeachment with statements elicited in violation of *Miranda*).

The analogy is unconvincing and the government has not cited to any case adopting the proposition that otherwise privileged communications can be used for impeachment purposes. Courts that have considered this precise question have reached the contrary result, as we do today. For instance, in *Commonwealth v. Chmiel*, the defendant successfully secured a new trial after arguing that his first trial counsel was ineffective. 738 A.2d 406, 408-09 (Pa. 1999). On retrial, the government was permitted to impeach the defendant with certain privileged communications with his counsel that were revealed during the earlier collateral proceedings. *Id.* at 409. The Pennsylvania Supreme Court reversed, explaining that

the defendant's privilege waiver was limited to "the purpose of demonstrating his prior counsel's ineffectiveness," and extending that limited waiver—even merely for impeachment purposes at a new trial—was unwarranted. 738 A.2d at 423 (observing the "chilling effect on defendants' exercise of their right to the effective assistance of counsel"); *id.* at 424 (prohibiting the communications from being "utilized for any purpose at retrial"); *see also Nicholson*, 611 F.3d at 217 (explaining that *Bittaker* protective order "preclud[es] use of privileged materials *for any purpose*") (emphasis added). *Chmiel*'s reasoning is that a defendant should not be put in a worse position by virtue of having vindicated their constitutional right to the effective assistance of counsel, which would be the result of permitting government impeachment.

At bottom, the scenario before us is not one where we conclude that permitting the government to impeach defense witnesses with otherwise privileged material is worth the potential costs. Those costs include both (1) deterring defendants from pursuing potentially meritorious ineffective assistance of counsel claims, and otherwise (2) stifling defense counsel's candid communications and diligent investigations for fear that they might ultimately be used against their own clients. Where the materials were disclosed to the government only in order to vindicate a defendant's right to a fair trial, the defendant should be restored to a position where

they did not have to undertake those collateral proceedings in the first place, so that the government is precluded from using the otherwise privileged defense disclosures even for purposes of impeachment.

## D.  Harm

Having found that the trial court erred in allowing the government to use the memos as impeachment evidence during Waters's retrial, we now address whether that error warrants reversal.  In order to resolve the issue, we must determine which harmless error test to apply, which turns on whether the error is of constitutional magnitude.  *See Clark v. United States*, 639 A.2d 76, 82 (D.C. 1993).  Waters urges us to apply the standard for constitutional errors and vacate the conviction unless the government can establish that any error was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967).  The government counters that because we are reviewing the court's Jencks Act determination, which is at least superficially statutory, we ought to apply the harm standard applicable to non-constitutional errors, which demands reversal unless we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the [convictions were] not substantially swayed by the error."  *See Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

We agree with the government that Jencks Act rulings are generally not of constitutional dimension,[4] so we apply the *Kotteakos* standard applicable to non-constitutional errors here. *See Middleton v. United States*, 401 A.2d 109, 122 n.29 (D.C. 1979) ("[T]he statutory discovery principles of the Jencks Act are not to be considered constitutional dogma."). Because the Jencks issue can be reviewed under *Kotteakos*, we do not address how we might otherwise review the harm stemming from an intrusion on the work product privilege that was not otherwise premised in the Jencks Act. Had the trial court been correct in its application of the Jencks Act here, there would be no violation of the work product privilege, so we apply the harm test applicable to this predicate statutory error.

In applying *Kotteakos*, we conclude, with fair assurance, that Waters's convictions were not substantially swayed by the errors. We first address Moore's testimony, and his impeachment with the Eidell memo, because we can do so briefly. Moore's testimony was not particularly helpful to the defense in the first place,

---

[4] It is possible that an erroneous Jencks ruling could sweep in so much defense material—or defense material that is so important—that it could arise to constitutional error. But this case does not cross that line. The government makes a colorable argument that the memos were Jencks material, and it seeks to use Jencks only to justify its use of portions of two memos, which pertain to two specific witnesses. This, therefore, is a run-of-the-mill non-constitutional Jencks issue.

saying only that he looked out his window "three to five minutes" after he heard gunshots and saw Waters walking up the steps from Wade Road to Birney Place, and then Moore went outside and met Waters. That is not what we would characterize as an alibi; it instead puts Waters at the scene in the minutes after the murder. Perhaps the thinking goes that it would be surprising if the killer *returned* to the scene minutes after the murder—coming up from Wade Road—but the Eidell memo bolstered rather than impeached Moore on that point, by indicating that Moore "saw [Waters] shortly after the shooting walking up the path . . . from the area of Wade Road." The only impeachment of Moore from the Eidell memo is that, according to the memo, Moore did not initially report seeing Waters *from his window*, a point that seems facially irrelevant. This was anemic impeachment of an already insignificant defense witness.

As for Williams, recall that she did provide an alibi in her testimony (saying she was with her close friend, Waters, at the time of the shooting), and that the Krut memo was used as evidence that she made no mention of this fact during the interview, about three months after the shooting. But Williams's alibi testimony faced far greater problems than that. First, Waters himself contradicted Williams's alibi, as he had told police that he was first with Mills and then his daughter on the night in question, rather than Williams. Second, assuming a jury might overlook

that, there was independent evidence—not just the Krut memo—to the effect that Williams made no mention of being with Waters on the night of the shooting in the months thereafter. Williams spoke to the police after the murder and did not mention that she was with Waters at the time of the shooting. She did not alert, or claim to have informed, anybody of this alibi when she learned that Waters had been arrested for the murder. We acknowledge that witnesses are often reticent to become involved in a murder investigation. But that reticence typically does not extend to when somebody knows their close friend has been falsely accused of and arrested for murder. And such reticence, if the jury believed it was so powerful, could also explain away the force of the impeachment—maybe Williams did not tell Krut about the alibi because she did not want to become involved. In short, Williams's alibi testimony contradicted Waters's own account of his whereabouts, and the Krut memo impeached her only on grounds that she was otherwise forcibly impeached on.[5]

---

[5] Waters's first trial counsel chose not to call Williams for these very reasons. He testified at the § 23-110 proceeding that Williams's alibi was "contradicted by Mr. Waters's statement to the police," and that when she "was interviewed by PDS, she did not state that she was with Mr. Waters at the time of the shooting." To be sure, the failure to call Williams was part of the trial court's basis for finding that trial counsel was ineffective in that first trial, though as a standalone decision it strikes us as a reasonable one.

When viewed in the context of a government case that included multiple eyewitnesses who identified Waters and who had no apparent motive to lie, we conclude that the erroneous introduction of the defense memos was harmless.

## III.  The Testimony About Green's Past Statement

Waters also argues that the prosecutor's questioning of Green and subsequent questioning of a detective about Green's statements were improper and require reversal.  Recall that the government asked Green a leading question suggesting that he had previously said Waters "came through the cut and shot" Harris, though Green denied making any such statement.  The government then elicited from a detective that Green had previously made that statement, though there was some dispute about whether Green was speaking from firsthand knowledge or instead relaying hearsay (if the former, the evidence was admissible, but not if the latter).  The government explained its "understanding was that [Green] was relating firsthand information" indicating "that's what he said, was that he saw it, but we couldn't confirm that." Rather than ruling on whether the government had laid a sufficient foundation to establish that Green was speaking from firsthand knowledge, the trial court struck the testimony and issued a curative instruction telling the jury to disregard it.  We conclude that, even if the government improperly introduced evidence about Green's

prior statement, the error was harmless.

## A.  Additional Background

Green, a defense witness, testified during the retrial that he had been with Harris on the day of the murder and had observed a disagreement between Harris and Turner about money.  He testified that he then went home and did not see the murder.  On cross-examination, the government asked a series of questions about an interview that the prosecutor had conducted with Green about the murder nearly eight years earlier.  Over defense objection, the government asked Green:

> Q Do you remember telling us that [Waters] came through
> the cut and shot [Harris]?
>
> A No, ma'am, I don't.

Shortly thereafter, defense counsel requested to view the prosecutor's notes from the meeting and then renewed his objection to the government's questioning about the interview, noting that it was unclear whether Green had witnessed the murder or was merely relaying what he had heard.  The court denied the motion to strike the questioning because Green had answered the question in the negative, but agreed to remind the jury that questions are not evidence.  The court suggested that

the government could prove up Green's supposed statement with testimony from Detective Dwayne Corbett, who interviewed Green. Defense counsel noted that they would continue to object to any attempt to do so.

The court nonetheless allowed the government to "complete the impeachment with respect to Perez Green" during its questioning of Corbett. The government did so, as follows:

> Q And at that point, Detective, did [Green] describe for us a murder that occurred?
>
> A Yes.
>
> Q And what did he say?
>
> A He said [Waters] came through the cut and shot [Harris].

On redirect, defense counsel asked Corbett whether he believed that Green had personal knowledge of the murder or if he seemed to be "relating what he had heard from others." Corbett responded that "[i]t was unclear if he actually witnessed it or learned it from someone else." Concerned that Green's prior purported statement was not based on firsthand knowledge, the court gave the jury a curative instruction that when determining what Green may have seen, they were only to consider Green's earlier testimony, not that of the detective. Neither party objected or sought

a mistrial.

## B. Harm

Waters argues that we must reverse his conviction because it was improper for the prosecutor to have questioned Green and Corbett about Green's out-of-court statement. Assuming so, we conclude that any error was harmless.

To assess harmlessness, we must once again determine the threshold question of whether this alleged violation is of constitutional magnitude. Waters argues that the more stringent *Chapman* standard for constitutional violations should apply because his Confrontation Clause rights were violated. "[T]he Confrontation Clause bars the government from introducing testimonial statements at trial against a criminal defendant *without calling the declarant to testify in person*." *Thomas v. United States*, 914 A.2d 1, 11 (D.C. 2006) (emphasis added). Because the declarant of the contested statements, Green, did testify in person, there can be no Confrontation Clause violation. The violation, if any, was of evidentiary rules generally barring hearsay, which Waters agrees are subject to the less stringent *Kotteakos* test, 328 U.S. at 765, which we now apply.

We conclude that, following the *Kotteakos* test, we can say with fair assurance that Waters's convictions were not substantially swayed by the error, even when viewed cumulatively with the previously discussed erroneous admission of the Krut and Eidell memos. *See Gardner v. United States*, 140 A.3d 1172, 1197 n.38 (D.C. 2016) (we address the cumulative effect of all the errors combined in determining whether to reverse). There were multiple credible eyewitnesses to the murder. Ruth, Goode, and Sibley all testified that a man in a white vest or t-shirt, khaki shorts, and a black facemask with the eyes and mouth cut out was standing on Birney Place with Harris and Turner. Ruth and Sibley saw Waters shoot Harris, and Goode saw Waters walking away from the body. Ruth and Goode both recognized Waters and, though Sibley did not know or identify him, her testimony of his clothes and appearance matched that of the other witnesses. The differences in their testimony—such as whether the shirt had sleeves or not, whether Moore was also there, and the length of time that passed between the argument and the shooting—were the kinds of minor details that could be chalked up to faulty memory.

The defense did not suggest that these witnesses were fabricating their testimony. Rather, the defense argued that each witness had simply made a mistake in thinking the shooter was Waters, pointing to Ruth's history of mental illness and the fact that Goode initially told the police she did not recognize the shooter. But

though each of these arguments might be convincing on their own, they become significantly less convincing where two witnesses independently and unequivocally identified the defendant, and where their descriptions are corroborated by a third witness. In short, the jury heard testimony from several witnesses, with no motive to lie, who identified Waters as Harris's shooter. Given these circumstances, Green's statement that Waters had shot Harris—even if we assume it was improperly admitted and that the trial court's curative instruction striking Detective Corbett's testimony could not cure the taint—added little to an already-strong government case. The jury heard only the hearsay of a potential fourth person to effectively identify Waters as the killer, and that person denied making any such statement. Where Green himself denied making the statement, we have fair assurance that the jury would not give it dispositive weight over the three largely unimpeached eyewitnesses who testified consistently, implicating Waters as the killer.

## IV. Conclusion

We affirm.

*So ordered.*